Jenkins, McRae and Clinton v. The State.—Syllabus.

IRVING JENKINS, WILLIAM A. MCRAE AND MARION CLINTON, PLAINTIFFS IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. In pleas in abatement setting up simply irregularities in the selection of jurors, the greatest accuracy and precision in pleading are required, and such pleas must be certain to every intent.

2. Chapter 4015, acts of 1891, was repealed by Chapter 4122, acts of 1893, but the latter act did not repeal section 1157 of the Revised Statutes, authorizing Circuit Courts, whenever for any cause no petit jurors, or less than the whole number, had not been drawn or summoned in the manner provided by law for any regular or special term of the Circuit Court, to issue a special venire for a sufficient number of such jurors for such term, to be summoned from the bystanders, or the body of the county at large; and a plea in abatement alleging simply that an indictment was found by a grand jury not drawn according to the act of 1893, but was summoned from the body of the county at large, is bad on demurrer.

3. By section 2813 R. S., as well as by public policy, a grand juror should not be permitted to state or testify in any court in what manner he or any other member of the grand jury voted on any question before them, or what opinion was expressed by any juror in relation to such question, and to this extent the secrecy of the grand jury room is absolute, but neither by statute nor public policy is the sanctity of the grand jury room carried further than the restriction embodied in section 2813, and a member of a grand jury may be required by the court, when public justice demands it, to testify to any fact, otherwise competent, and which does not violate the restriction stated. The express provision in section 2814 as to the cases in which a grand juror may be required to testify does not exclude an enquiry into other cases sanctioned by law.

4. It is made the duty of the State Attorney, when required by the grand jury, to examine witnesses in its presence, and to give it advice upon legal matters, and whenever it is proper for a grand juror to testify as to statements of witnesses before that body, the State Attorney can likewise testify as to such matters if within his knowledge.

47

| 35 | 737 |
| 36 | 377 |
| 35 | 737 |
| 38 | 17 |
| 38 | 50 |
| 38 | 84 |
| 35 | 737 |
| 40 | 224 |
| 40 | 245 |
| 40 | 250 |
| f40 | 514 |
| 35 | 737 |
| 41 | 269 |
| 35 | 737 |
| 42 | 269 |
| 35 | 737 |
| 43 | 518 |
| 43 | 569 |
| 35 | 737 |
| 44 | 427 |
| 44 | 444 |
| 46 | 11 |
| e49 | 120 |
| e49 | 122 |
| 35 | 737 |
| 51 | 116 |
| 35 | 737 |
| f53 | 24 |
| 53 | 454 |
| 35 | 737 |
| 57 | 4 |
| 35 | 737 |
| 58 | 127 |

5. Where a party indicted for an offense has voluntarily testified in reference thereto before a grand jury in their investigation of such offense. prior to his being officially charged with or arrested for the same, his statements before the grand jury so voluntarily made, though under oath, may be given in evidence on his subsequent trial for said offense, for the purpose of contradicting other statements made by him in reference thereto; and where it is shown that the official conducting the examination before the grand jury instructed the witness that he need not testify unless he was willing to do so, and that he could not be compelled to criminate himself, his statements voluntarily made under such circumstances are admissible against him.

6. The statement of a witness before a grand jury, as reduced to writing by the State Attorney, but not read to or signed by the witness after being so reduced to writing, has not been invested by statute with the force of a binding record against such witness.

7. The State Attorney, conducting the *ex parte* examination of a witness before a grand jury, reduced his testimony to writing, and on a subsequent trial of the witness, on an indictment charging him with the offense in reference to which he was examined before the grand jury, the written statement itself of the evidence before the grand jury, as reduced to writing by the State Attorney, was offered and admitted as independent evidence for the purpose of contradicting other statements of the accused put in evidence by the State in reference to the crime charged: *Held*, That the admission of such statement of the evidence was error, and that while the State Attorney might testify of his own knowledge what the accused stated before the grand jury, such written statement was not *per se* competent evidence of what was stated before the grand jury.

8. The only proper way to deal with hearsay evidence when offered to the jury and objected to is to exclude it from the case.

9. Proof of overt acts or declarations by one in pursuance of a common purpose or design on the part of several to commit a crime may be given in evidence against all of the conspirators, but such acts or declarations, to be admissible, must be such only as were done and uttered during the pendency of the criminal enterprise and in furtherance of its objects. If they occur at a subsequent period, and are merely narrative of past occurrences, they are not admissible against any but the party making them.

10. All evidence that is material and relevant, and that tends to prove the guilt or innocence of the accused, should be submitted to the jury; and although the relevancy of any fact, when standing alone may not be apparent, yet, when taken in connection with any other fact, or all the other facts properly admitted, its relevancy is made to appear, it should be admitted in evidence for the consideration of the jury. This rule should not, however, in purely circumstantial cases, any more than in others, be carried to the extent of infringing upon the further rule, that all evidence should be confined to the question in issue and tend to prove some essential fact involved in the issue in the case. Testimony that does not tend to prove motive, or establish some other material fact essential to the crime charged should not be admitted, and especially when it may tend to produce an erroneous impression on the minds of the jurors to the prejudice of the accused.

11. It is within the discretion of the court to regulate the order of the introduction of evidence, but when irrelevant testimony is offered and objected to, and it is admitted by the court on the theory that its relevancy may be shown by subsequent evidence, if such evidence is not introduced, the irrelevant portion should be excluded by the court without further motion on the part of the party objecting.

12. In considering an objection to a portion of a charge, the entire charge to which the objection relates must be looked to, and if the charge as an entirety is free from the objection made, it will be sufficient.

13. In a case of purely circumstantial evidence, a charge asserting that "in a case of this kind the conclusion to which the jury are conducted is that degree of certainty that they would come to in their own grave and important concerns, and that is the degree of certainty which the law requires, and which will justify them in returning a verdict of guilty from all the facts and circumstances laid before them," is wrong, in this, that it establishes a standard or degree of certainty upon which the jury can convict, wholly insufficient to authorize a verdict of guilty in criminal cases.

14. Comments of counsel in arguing a case before a jury are controllable in the discretion of the trial court, but this discretion is subject to review, and when counsel indulge in material statements outside of the evidence, and which are likely to do the accused injury, it will be deemed an abuse of discretion when not stopped by the court on objection made. Such ob-

jection should be made at the time of the abuse of the privilege of argument, and the action of the court overruling the objection, and the fact that exception was taken to such ruling should appear with the objection in the bill of exceptions.

15. Under the rule announced as the privilege of argument of counsel, a portion of the remarks of counsel objected to and pointed out in the opinion, was improper, while other portions were allowable.

16. The return of a jury in a case, involving a charge of murder, that they found the defendants guilty as charged, but recommended one of the defendants to the mercy of the court, can not be considered by the court as a verdict of murder of any degree, or any verdict at all, and the case still remains with the jury, and the court can not then, any more than at any other time, intimate to the jury what their verdict should be. Cases on the subject of the return of verdicts by juries referred to.

Writ of Error to the Circuit Court for Lake county.

The facts in the case are stated in the opinion of the court.

*E. K. Foster* and *Miller & Austin*, for Plaintiffs in Error.

*Alex. St. Clair-Abrams* and *The Attorney-General*, for Defendant in Error.

BRIEF OF EXCEPTIONS BY ALEX. ST. CLAIR-ABRAMS.

The first exception taken by the defendant's counsel was on the empaneling of the jury. One Garland was sworn on his voirdire and testified that he had not formed or expressed any opinion and was not conscious of any bias or prejudice for or against the accused and could go into the jury box and render a fair and impartial verdict according to the evidence.

On his examination by counsel for the defense he testified that he had taken out his first papers and de-

·clared his intention of becoming a citizen, but had not taken out his final papers. He also testified that for two or three months of the previous year he had been absent in the Bahama Islands, and had intended if he liked them to have stayed there, but had not aban-·doned his residence in Lake County, Florida.

He was challenged by the defense on the ground that he was not a citizen of the United States and that he had left the State within the last twelve months with the intention of remaining if he was satisfied with the new locality. The court ruled him competent and he was thereupon challenged peremptorily by the defense. There was no error.

It was not necessary for a juror to have been a citizen of the United States; he was under the Constitution of Florida (section 1, Article 16 of the Constitution) a qualified voter of the State, and he was consequently a qualified juror (section 1, Chapter 4122 of the laws of Florida). It was sufficient that he had not abandoned his residence in Florida when he left for the Bahama Islands, as his intention to change his residence was purely conditional and contingent.

In the case of the State of Florida vs. Medoil, 12th Florida 151, the court says that "the fixed domicile of a juror in the county in which the court is, without regard to length of time of such domicile, is sufficient to constitute the party a juror; neither want of length of residence or qualifications as a householder is such an objection to a juror as will justify the setting aside a verdict.

S. A. Cunningham another juror on his voirdire testified that he had expressed an opinion concerning Jenkins' guilt or innocence but that such opinion would not prevail with him in the consideration of the case; that he had no bias or prejudice resting on his

mind for or against any of the accused, that he could give the accused a fair and impartial verdict according to the evidence.

On his cross examination he testified that he had not changed his opinion, and that it would require testimony to change it, but upon being questioned by the court, he distinctly stated that the opinion he had formed and expressed would not weigh with him in making up his mind, but that he would be guided entirely by the evidence. The court therefore overruled the challenge for cause and the defendants' counsel premptorily challenged the juror. The ruling of the court in this case involved questions which have been determined by the Supreme Court in O'Conner vs. The State, 9th Florida 215; Montague vs. the State, 17th Florida 662, where the court held that "if it appear upon a voirdire examination that a proposed juror's suspicions are not fixed and settled nor warped by prejudice, but are only such as would naturally spring from public rumor or newspaper report and his mind is open to the impressions it may receive on trial so as to be fixed according to the law and the testimony, he is not incompetent."

In Andrews vs. The State, 21st Florida 598, the court held that "where a venireman stated on his voirdire that he had formed an opinion as to the guilt or innocence of the accused who was charged with the murder and that it was not formed from seeing or conversing with the witnesses in the case, and if he went into the jury box he would give a verdict according to the evidence; that it would take a reasonable amount of evidence, and that it would take conclusive evidence to change his mind." On such a statement the court held that while it was error to rule him competent under that statement of his, that nevertheless where he is per-

JANUARY TERM, 1895.        743

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

emptorily challenged and it does not appear from the record that its peremptory challenges were exhausted before a full jury were sworn, it would not be a material error for which a new trial would be granted. In this case the verdict was reversed on another ground and the court so states, asking the very pertinent question'' when as in this case it did not appear that the prisoner exhausted his peremptory challenge, and it is true that the juror chosen is in law unacceptable what damage has been done the prisoner by erroneous ruling complained of.'' It will thus be seen that even if the ruling was erroneous it would not be ground for a new trial. In this case the defendants not only did not exhaust their peremptory challenge, but when the jury was made up still had a large number of peremptory challenges unexhausted.

Two other jurors, namely, W. H. Whitcomb and B. O. Hall, were declared incompetent. Whitcomb testified that he was biased in favor of one of the defendants, and that from what he knew then, he did not think he committed the crime. While B. O. Hall testified that he had conscientious scruples against capital punishment, and would have to have positive proof before he would convict the accused. In answer to a question by counsel Mr. Hall stated that he would not convict unless he believed that it was impossible for anybody else to have committed the crime. It is scarcely necessary to call authorities to sustain the ruling of the court declaring these jurors incompetent as their answers on voirdire show the bias of Whitcomb and the conscientious scruples of Hall.

Both in McDowell vs. The State and Andrew vs. The State the decision of the court below in those cases was sustained by adjudication in this.

744 · SUPREME COURT.

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

Of all the objections made and exceptions taken during the empaneling of the jury, it is sufficient to call the attention of the court to the fact that in no way were the defendants injured by the rulings; they were not forced to exhaust their peremptory challenges; they secured a jury satisfactory to them, and we hold with the Supreme Court of Louisiana in the case of The State vs. Ford, that "when it appears by the record on a murder trial that a juror has been peremptorily challenged by the accused and did not serve on the jury, the error in the ruling of the district judge declaring his competency will not invalidate the trial, as the accused was not prejudiced thereby.

In the examination of Francis J. Packwood, the witness testified that he went to see McRae the defendant before he left his place, and told him that he was going to leave the next day; that he was rather short of money, and if McRae could pay him the sum that he owed him it would be very acceptable. The counsel for the State then put the following question: "You say that you told him the day before you left that you intended to leave the next day?" To which the witness answered, "Yes, sir." Counsel objected to the question and answer because if the witness started to state the conversation he ought not to interrupt him, and that the witness ought to be allowed to finish before any other question was asked. It will be noticed that the question asked and the answer given was simply a repetition of the testimony already given by the witness and appears to have been put by counsel to satisfy himself as to the tenor of previous answers.

There was nothing important in it. It in no way prevented the witness from stating the whole conversation; nor do we know of any rule of law which prevents counsel from putting questions to witnesses dur-

ing the narration of a conversation between witness and any other person. Indeed it not unfrequently happens that counsel finds it necessary to interpolate questions during the narration of a conversation, so as to bring out the conversation more fully, or in many cases to prevent the witness diverging into irrelevant or frivolous statements. Following this question, counsel for the State asked Mr. Packwood as follows:

Q. "Mr. Packwood, state whether or not in that conversation you informed William McRae, or stated to him, how long a time you were likely to be absent?" This question was objected to because the proper way to get at a conversation is not to put it in leading questions that way, but to ask what the conversation was. We can not understand in what way the question was leading. Whether or not McRae had knowledge or had been informed how long Packwood would be absent, was a proper inquiry. The question was open to an affirmative or negative answer, and when the objection was overruled, the answer of the witness was that he could not remember whether or not he said how long he would be absent, but that McRae knew he was generally absent only two or three days at a time. We can not understand the force of this objection or in what way the defendants were injured either by them or by the answer.

Dr. A. J. Godwin had testified to having found the person of Miss Bruce exposed and the hair of her privates forcibly driven inward and remaining there. That this was unusual and unnatural was evident from his testifying that it attracted his attention when he first saw it.

The fact that he adduced therefrom was that there must have been a rupture of the hymen, and the testimony all went to proving the corpus delicti as well as

746 SUPREME COURT.

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

towards showing motive for the murder. He testified that he had inserted a probe into the vagina with a clean piece of cotton, and that when he withdrew it there was an accumulation of matter upon it. It therefore became important to know what that accumulation of matter was. Dr. Godwin testified that he had made a microscopic examination of the matter some two or three days afterwards, when he could get a microscope. And having so stated, the question was then asked him, "What was the result?" (meaning the result of the microscopic examination). On defendants' counsel objecting to the question, the counsel for the State examined the witness as to his professional qualifications. He stated that to assist in his education as a physician (but not as a specialist) he had used the microscope for such purposes; that he was familiar with the organs of generation of men and women; that he was familiar with the seminal discharge of the male and could tell its nature and character by microscopic examination, not being able to distinguish it with the naked eye.

Having thus qualified himself as a physician for stating what the matter was on the cotton, the question was again repeated to him: "State what you saw." The defendants' counsel objected to the question because the witness had proven that he was not an expert.

No question had been put to the witness calling for an expression of opinion on his part; he was asked to state what he saw as a matter of fact and to testify to the same just as any other witness would be called upon to testify as to a matter of fact. It is laid down by Burrell on circumstantial evidence, "There is no sort of fact imaginable to which it may not happen to serve as evidence with relation to some principal fact.

From the results of the most elaborate scientific researches down to matters so familiar and trifling as to scarcely attract the attention of a child, there is no fact which can be made the subject of human observation or knowledge but may come to be placed before a jury. The whole field of physical science may thus be laid under contribution as an aid to judicial inquiry.

In cases of crime, science is constantly resorted to especially for proof of a corpus delicti; cases of homicide in particular daily draw upon the stores of medical and chemical knowledge.''

It did not require the testimony of an expert at all. Pittman vs. State, 25th Fla. 648. Any person familiar with the subject who had made a microscopic examination of the spermatozoa and had become familiar with it could have testified to the fact of its existence or nonexistence, without being a physician or in any sense of the word an expert, and consequently the objection to the question was not well taken. In answer to this question the witness simply replied, ''I got no absolute satisfaction.'' This was not answering the question. He was not asked for any opinion, but was asked to state what he saw, or what he found, and the question was again repeated and the defendants' counsel again objected on the ground that the witness had stated that he was not absolutely satisfied in his mind with the result. The witness did not say that; the reply was ''I got no absolute satisfaction.'' He did not say what he saw or what the facts were as to the mass of matter. Again the question was repeated, ''What did not you see?'' To which he answered that it was a confused, mingled mass of puss, mucous, and other matters. The question was then put, ''What other matters, state from your opinion and knowledge as a physician.'' He answered, ''I could not absolutely determine on ac-

count of the commingling." These evasive answers of the witness show that he was reluctant or unwilling or both, whereupon counsel for the State put the question directly, "Did you discover any traces of human sperm in this matters?" This question was objected to and the objection sustained, whereupon counsel for the State altered the question as follows: "You say there were other matters besides pus, mucous, etc." To which the witness answered: "Well I say apparently so—nothing definite could I determine—well the shortest way out of it, I did not obtain a perfect spermatozoa. I only obtained imperfect matters commingled with others that might have been spermatozoa." Then followed the question, "What do you mean by spermatozoa?" To this question defendants' counsel objected although the witness had just previously stated that he had not obtained a perfect spermatozoa, thus intimating that there were imperfect ones in the mass of matter taken from the body of Miss Bruce. The State had a right to the question as tending to show motive for the murder as well as forming part of the corpus delicti. The right of the State to obtain from the witness the result of the examination of the body of the deceased is too well settled to need argument. Besides, as is shown from scientific researches, great difficulty is often experienced in obtaining unbroken specimens of spermatozoa, not only because of the tendency to separation of the head and tail of the organism by mechanical rupture but because spermatozoa are known to be very brittle and very easily ruptured by any rough handling of the fabric on which they may be shown. Ungar holding that a separation of the head from the tail also takes place during the swelling of the dry spermatozoa when moistened with water for the purpose of exami-

nation. (See Taylor's Medical Jurisprudence, page 669.) See Burrell on Circumstantial Evidence, edition of 1868, pages 683 et seq. On page 723 of the same book, the writer says "In rape, the corpus delicti consists of the fact that the person of the complaining party has been forcibly violated. The facts which go to show the commission of this offense as distinguished from those which connect the accused as the perpetrator, consist of the appearance of the person or clothing of the female, a description of which may be found in the works on medical jurisprudence last quoted."

An explanation of what spermatozoa was, was relevant to the issue of the case. It is not to be presumed that the jury were composed of doctors and scientific men and consequently it was not unlikely that they were unfamiliar with what was meant by "spermatozoa." As laid down in the case of Mc. Cue vs. Commonwealth, 78 Pa. State 185, "Any evidence tending to show motive is admissible." And in the case of Frazier vs. The State, 55 Georgia 325, the court held that "on a trial for murder, any evidence which tends to show motive is admissible and material," sustaining the admission of the testimony of the illicit relations of the defendant with one of his step children as motive for the murder of Dr. Dunray who had taken the girl to his house and cared for her.

In the case of The State vs. Gedick, 43 New Jersey 86, the court sustained the admission of evidence by a doctor of bodily feeling and symptoms of pregnacy at the time of examination, as part of the facts on which the doctor's opinions were founded.

There was therefore no error in asking a description of it. So likewise after describing, the question was put whether or not the witness found any such in this mass of matter, and the answer was: "I think I an-

:swered it once." The answer was evasive and did not respond to the question, and consequently there was nothing upon which the defendants could except. As was said by the Supreme Court in the case of Archer vs. The State, 45th Maryland 83: "Even if the question was an illegal or improper one put to the witness against the objections of the defendants, they are not injured and can not complain if the answer is one that does not prejudice them." As will be seen in the case of this objection, the answer was simply a repetition of the former evasive testimony of the witness.

These objections cover the exceptions taken from page 169 to page 175 of the record of testimony and went directly to prove the corpus deliciti and to show motive. The theory of the State was that the person of Miss Bruce had been violated before murder. The first circumstance tending to prove this theory was the discovery by Dr. Godwin of the body of Miss Bruce in the condition stated. She was an unmarried woman which renders it more improbable that the hair could have been driven inwards by natural causes, as it was found. Besides the ease with which the probe seems to have entered the vagina would indicate the nonexistence of the hymen, although we admit that this could not be absolute evidence of any violation of her person, it being well known in science that the hymen is frequently ruptured from other causes than that of sexual intercourse. It is, however, certain that the condition in which she was found creates a strong probability that force was used upon her person. The condition of the parts was unnatural. It is certain that there was an accumulation of matter in the vagina, consequently it became important to ascertain, if possible, what that matter was. The ordinary exudation from the walls of the uterus of a healthy female is

JANUARY TERM, 1895.  751

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

almost imperceptible. If there is any catarrhal dis-
charge it might be profuse, while if seminal fluid had
been injected therein, it might remain there within a
living person as many as eight days afterwards as
stated in Taylor's Medical Jurisprudence, although
the seminal fluid ordinarily passes out soon after cop-
ulation.

If Miss Bruce's person had been viotated between
ten and eleven o'clock at night, and the murder had
been perpetrated between two and half past three the
following morning, it is quite probable that the semi-
nal fluid injected at the time of the rape, must have
been found there commingled with such other matters
as may have exuded from the walls of the uterus be-
fore or afterwards.

It therefore became important to ascertain whether
or not the body had been violated and the courts have
always permitted the largest latitude in such cases.

In the case of the People vs. Barker, 60th Amend-
ment 277, the court held that "there being testimony
that from the appearance of the body that there had
been multilation of the scrotum, and that the testicles
were absent, proof by medical witness that the sub-
stance found on a log near by was that called testicles,
though whether of a human being or not, they were
unable to say" was held admissible.

It is of course to be regretted that other and addi-
tional methods of examination were not employed by
the physician, and that no examination whatever was
made of the person of Mrs. Hatch. In fact the entire
examination seems to have been crude, the apparent
purpose being to get through as rapidly as possible,
hence there was not that nice, close discriminating
investigation, which would have thrown additional
light on the subject. The clothing of Miss Bruce was

752 SUPREME COURT.

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

covered with blood, but it was not ascertained whether it was the blood which flowed from the wounds on her head and face, or uterine blood. One article of clothing (her drawers) was not only stained with blood, but also stained as though with some other discharge. There does not appear to have been any microscopic or other examination of this article of clothing, although such examination might have added additional evidence, it being a well known scientific fact, as laid down by all writers on the subject, that the stains of the seminal discharge of the male can be readily distinguished under the microscope investigation for a considerable period of time after its emission—in one case after a period of eighteen years. (See Taylor's Medical Jurisprudence).

Foundation to show motive was laid by the evidence of the forcible driving in of the hair covering the privates of Miss Bruce, and it was important to ascertain what the matter was that was taken from the uterus. Except in one question which was not answered, the opinion of the witness was not sought. He was asked to state the facts and to testify from his knowledge of the seminal fluid, the study and examination of which formed part of his medical education, whether or not any seminal fluid of the male was mixed in the mass of commingled matter, and the testimony was clearly competent. He was not asked to express any opinion, as the question involved no matter of opinion at all. He was not asked to express any opinion as to whether there had been a violation of her person or whether she had had sexual intercourse with any person. From the very nature of things it was impossible for him to state how this matter had found entrance into the uterus of Miss Bruce. There was no hymen, and hence external evidences of virginity were absent. She may have had

voluntary sexual intercourse, but this presumption would be rebutted by the external appearance of her parts. It is reasonable to conclude that if there was any seminal fluid in the vagina, or any trace thereof, it had not gotten there from voluntary sexual embrace. Neither is it reasonable to suppose that the hair covering the vagina had been driven inward from any natural causes. The fact only was asked of the doctor, and he testified he had not obtained any perfect spermatozoa. The inference consequently was that what he had obtained were imperfect, and therefore it became necessary to explain to the jury what spermatozoa was and the effect of time and circumstance upon it.

We can not conceive wherein any expert testimony, in the strict sense of the word, was necessary. It does not require a specialist to testify to a fact. As a physician Dr. Godwin was acquainted with all the matters and things he was called upon to testify to, and to all purely external facts any person might testify without being an expert.

Dr. Godwin had sworn that he knew and was familiar with the spermatozoa of the male; he was then asked to state as a matter of fact whether or not he had discovered any in his investigation. If he could not obtain any perfect or complete specimens he had a right to explain whether or not the action of the other matters, whether alkaline or acid, would tend to the disintegration of the spermatozoa and thus explain the imperfect matter found by him. Nor can this prejudice the defendants in any form. It was a part of the res gestea; it went to show motive, just as in the case of The People vs. Martell, 138 N. Y. 595, the court held that "on a trial for murder the admission of a

754 SUPREME COURT.

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

declaration by defendant's mistress that there would be a fight when defendant and deceased met, because the defendant was jealous of him, though erroneous as being the declaration of a third person in the absence of the party was error without prejudice in that it tended to show jealousy to be his motive."

So likewise in the case of the State of New York vs. Harris the Appellate Court of that State sustained the introduction of testimony of his illicit relations with other women as going to show motive for the murder of his wife. This decision, while stretching the testimony as to motive to its utmost tension, was relevant, although it did not necessarily follow that a man would seek to poison or otherwise murder his wife because of his illicit relations with other women; and yet the Court of Appeals of New York sustained the introduction of this testimony, contending that it tended to show motive, although to a very slight extent. And in the case of O'Brien vs. The Commonwealth of Kentucky (89th Ky. 354) the Court held that "letters from the defendant to two other women showing his relations to one of them, he being engaged to be married to one and intimate with the other, was admissible to show motive for desiring to be rid of his wife." (See Preston vs. State, 8 Tex. App. 38).

To the extent that the witness was an expert, the testimony was proper as the proper vocation of expert witnesses as set forth in Kyle vs. The Commonwealth, 104 Pa. State 117, "is to instruct the court and jury in a matter so far removed from the ordinary pursuits of men that actual knowledge of them can only be gained by study and experience; the object being to enable both court and jury to judge intelligibly of the force and application of the several facts introduced in the evidence."

It was clear from the external circumstances surrounding the scene of the murder that robbery was not the motive of the crime. It was therefore the duty of the prosecution to ascertain if any other motive had prompted this wholesale butchery of four human beings.

As in all other cases of circumstantial evidence, there were left on the person of Miss Bruce traces indicating a motive other than robbery. Referring to this branch of the evidence Mr. Burrill says: "It has however left traces more or less numerous, consisting of physical objects (some still existing in specie), cotemporaneous impressions made on the senses and memories of individual observers. The great object of all investigation is to collect these scattered remnants and vestiges of action; to examine and compare them; to adjust them to each other by the means of indications which they themselves immediately furnish as well as by the aid of general principles of presumptive reasoning; to ascertain as to where their original place and position was; and by this means reconstruct the case as far as possible out of them; to recall it from the past and to present it as a subject for consideration in a state as closely approximating the form of its original appearance as may be practicable."

If the defendants had not committed the murder, it was of no possible consequence to them what the motive for it was. If they had committed the murder, the fact of a previous outrage could not in any way increase the gravity of their offense. The testimony was proper and in no way prejudiced the defendants. It was in every sense a part of the res gestea of the case, calling simply for facts which might or might not tend to show motive for the crime, and which were in their very nature so closely allied with the murder

itself as to become a part of the corpus delicti. Again and again it has been held that while it is not necessary to show motive for the commission of a homicide, as the law always presumes a motive of which the defendant is possessed, yet if there are any external facts and circumstances, however slight, which tend to show a reason for the commission of the crime, such facts and circumstances are competent and proper to introduce in evidence.

To close this branch of argument we might say that the facts relating to the condition of Miss Bruce's person are, to quote the language of Wills on Cir. Evidence, 6th Am. Ed., page 112, "Intimately related to and as it were dovetailed with the corpus delicti, and they are the links which establish the connection between the guilty act and its invisible moral origin."

In the matter of this testimony it is peculiarly noticeable that no matter of opinion was sought from Dr. Godwin. Unwillling and reluctant as the witness' answers show him to have been, the facts warrant the presumption that violence had been offered the person of Miss Bruce, and consequently all testimony relating to those facts are admissible. In the language of Burrill, page 312, the facts embodied in this testimony, "Taken by themselves would be allowed no great weight, but as corroborative elements in a mass of circumstantial evidence, they may become decisive as going to show motive." It may be claimed that the testimony did not show conclusively that there had been any violation of the person of Miss Bruce, but the legal presumption is that every crime has a motive, and the testimony was proper as tending, even slightly, to show why the murder was committed.

The next exception we find arose from objection by defendants' counsel to the witness Hatch testifying

concerning the red flannel skirt.   Hatch had testified
that some weeks before the murder Mrs. Berry had
given his wife some red flannel.   Mrs. Berry herself
had testified to having given this cloth.   McRae had
admitted seeing Mrs. Hatch with the red skirt on.
Witnesses had testified that there was a red flannel
skirt on the dead body of Mrs. Hatch, and the red
flannel skirt was produced in evidence and identified
by one witness as being similar to the one that Mrs.
Hatch had on when she lay dead in the room.   In an-
swer to a question which was not objected to, Hatch
said concerning this red skirt, "I know that my wife
made a skirt for herself, she told me she had, or rather
for herself and her sister, she made two; one she sent
to her sister and the other she said she was going to
keep."   Standing by itself this answer would be of
little consequence, and whether relevant or irrelevant
could in no way have injured the defendants.   It will
be observed, however, in reading the entire testimony
of Mr. Hatch, that the purpose was to show that his
wife had a red flannel skirt, and that after her death
the red skirt was not to be found anywhere about her
house; that the witness himself had gathered up her
clothing at her residence after the discovery of her
dead body, and that there was no red flannel skirt
amongst it; thus proving that the red flannel given her
by Mrs. Berry had been made up in a skirt and that
she had worn the skirt to the Packwood place; that
this red flannel skirt was the one that McRae saw Fri-
day and was the same one found on her dead body
and identified in court.   It also tended to confirm the
statement of McRae, one of the defendants, as to see-
ing Mrs. Hatch on Friday and to his remark that he
would never forget how she looked with her red skirt
and white waist on, and when we bear in mind the time

of the year and the condition of the weather at that time, the testimony was important as raising the question of whether or not he saw her with the red skirt on at the bars some distance from the house on Friday morning or when he saw her Friday night at the time of the making up of the bread, which he said she made up. In any event there was no error in the question and we submit that the question came too late. If the answer was relevant then the question which produced it was also relevant, and in the case of McCallum vs. State and Billings vs. State, Ala. 11th So. Rpr. 408-409, it was held that, "Where a defendant in a criminal case fails to object to a question calling for irrelevant testimony, it is not a matter of right to have the answer excluded, and in the first named case the same court held that, "Where no objection was made to an illegal question, and the answer was responsive, the court properly refused to strike it out, on motion, although the evidence was irrelevant." We can not, however, see wherein the testimony was irrelevant. The witness had stated that he knew that his wife had made this skirt for herself, and then added that she had told him that she had made one for her sister and for herself. Again this testimony bore upon the question of the corpus delicti and could not injure the defendants whether guilty or innocent. If error it was absolutely harmless. In the case of The State vs. Pughey, Iowa, the court held that, "The admission or introduction of evidence that is not of a controlling character nor of such a nature that its introduction or rejection would have effected the issue, can not be assigned as error."

So much for the answer of Mr. Hatch as referred to what his wife had told him was purely harmless, the red flannel skirt being there in evidence ident ified as the one taken from the body of his dead wife. (See

JANUARY TERM, 1895.     759

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

Preston vs. State, 8th Tex. App. 33; Exceptions to Vanderlip frivolous as the witness persisted in his declarations of lack of memory.

The next exception we find as to the testimony of D. E. Kurtz as to the bullets taken from the dead bodies of the victims. We can not see the force of the objection. The witness saw them taken out of the dead bodies, he saw them weighed. He identified what was taken from the head of Miss Bruce, testifying that he understood weighing (he having been a druggist); that they were weighed on druggists' scales, that he saw Dr. Godwin mark on each paper the weight of the bullet as each bullet was weighed; that he received them from Dr. Godwin, and that he delivered to the State Attorney, Judge Beggs, the bullets wrapped up in each paper, having identified them as being the bullets taken from the heads of the victims of the murder. It was the opinion of the court that he had not sufficiently identified the particular bullet taken from the head of Miss Bruce, but he certainly had identified all the bullets as being those taken from the three dead bodies, and one of the dead bodies being that of Miss Bruce it was certainly conclusive that one of the three must have been taken from the head of Miss Bruce. In order to ascertain the relevancy of the testimony and the lack of weight to the objection, it is necessary to read all the witnesses' testimony. The witness also testified that all the bullets were 32-caliber and stated that he was positive of it. Now these were the facts sought to be proven:

First. That the witness was present and saw the bodies exhumed.

Second. That he saw these particular bullets taken from the dead bodies and that he handled them and examined them.

Third. That he saw Dr. Godwin weigh them, that he saw Dr. Godwin mark the weights upon each of them and wrap them up and turn them over to him, the witness, who was sheriff of the county.

Fourth. That these particular bullets that he saw taken from the dead bodies, saw weighed and marked and wrapped up by Dr. Godwin and given to him were the same that he subsequently turned over to Judge Beggs the State's Attorney for the Seventh Judicial Circuit.

Fifth. That these bullets were 32-caliber bullets, which last fact was subsequently sustained and confirmed by the testimony of other witnesses.

It will also be seen from the evidence of Dr. Godwin, that he identified the bullets and the box in which they were placed, and his handwriting on the boxes, and the figures showing the weights, thereby confirming the testimony of the witnesses.

In what way therefore the testimony was irrelevant, we can not imagine. It was necessary to trace the bullets from the dead bodies from the time they were taken out up to their presentation before the jury, and this the testimony of the witness conclusively did.

One Nathan Williams, a witness for the State, had testified to a conversation he had had with the defendant Jenkins some months before the murder; he was then asked as follows: "Q. Now after the murder, did you receive any message from Irving Jenkins?" to which counsel for defendants objected. Counsel for the State stated, "We want to prove that he got a message." (By the court), "Are you going to prove what the message was?" Counsel for the State—"No, simply that he got a message." Witness stated that he had got a message and no further objection or exception was taken.

JANUARY TERM, 1895. 761

Jenkins, McRae and Clinton. v. The State.—Argument of Counsel.

It will be observed that this testimony was simply laying the foundation for subsequent evidence, and was therefore absolutely relevant as the message related to the murder and was conveyed to the witness by another witness who received it from the defendant Jenkins and so testified.

Mrs. Ed. Clinton, the mother of one of the defendants, testified to finding a shirt in the house where the defendant Jenkins and McRae lived, some weeks after the murder. She said, "I found it between the wall—right up in here, sorter under the edge of a box; I went to pick up the box to see if I could carry the box home; I had use for the box, and I thought I would take it if it was not too heavy, but it was too heavy and I went to set it back down, and when I did I saw this shirt and picked it up. "Q. Was the shirt against the wall? A. It seemed like by the way it was; it appeared like it might have been right under the box, and moving the box I seed the shirt as I set it down; I don't know whether it was up against the wall or under the box, but I seed it as I set the box down. Q. Was there any flooring in there? A. I think there was, is my recollection. Q. Was it on the floor? A. Well it seemed to me like there was a kind of split plank somewhere; I didn't notice point blank how it was fixed; it seemed to me that there was a kind of split board or plank, and it was kinder under that, and the moving of the box showed it; that is my recollection."

After identifying the shirt exhibited to her as being the same shirt found by her and testifying that it was dirty when found, she was asked whether or not she examined it when she took it to her house, and she answered she looked at it. She was then asked if she noticed anything on it, and she replied, "Yes, we no-

762    SUPREME COURT.

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

ticed that there was some specks on it." To the admission of this evidence the defendants' counsel objected and excepted to the ruling of the court admitting it. We can not see the force of this objection, as it was a matter of fact whether or not there was anything noticed on the shirt. She was not asked to testify if she knew what the specks were. These specks attracted her attention, and the shirt being shown to her, she identified a number of specks as being on the shirt when she found it. This evidence was not only relevant, but it was important because a subsequent analysis of these specks showed that they were blood stains. It was therefore important to prove that these specks or stains were on the shirt when it was found by the witness in the house of McRae and could not have been put on the shirt after it had left her possession and gone into that of the sheriff. It was necessary to show that these specks were afterwards proven to be blood stains and were on the shirt at the time she found it, and that she noticed them at that time.

N. B. Broward, the sheriff of Duval county, was put on the stand and testified to a conversation had with Jenkins while in his custody charged with selling liquor without a license. He stated that while he remembered several conversations he could not distinguish the one from the other, but could remember what occurred in all the conversations. The question was then put as follows: "Q. Tell all you heard? A. Anyhow in one of these conversations I said to Jenkins, 'Jenkins, who do you think committed that murder?' The defendants objected to the question because what the opinion of Jenkins was as to who committed that murder could not be used in evidence. The court overruled the objection on the ground that the testimony was a part of the conversation with Jenkins. What

Jenkins said was relevant, and the answer showed it
to be so, because the answer of Jenkins developed a
disposition on his part to throw the onus of the mur-
der on Mr. Packwood.   It was therefore properly ad-
mitted, and to understand its force and relevancy it
was necessary to admit all that Broward testified as
to the conversation with the accused.   Therefore what
the accused says concerning the offense with which he
stands charged is admissible testimony.   As will be
seen from an examination of the record, it was utterly
impossible for Mr. Packwood to have committed this
murder, and the language of the accused endeavoring
to cast suspicion on him was inculpatory.   Mr. Wills
in his work on Circumstantial Evidence, page 66, 6th
Am. Ed., says: "So natural and forcible is this rule
of presumption that the guilty are instinctively com-
pelled to endeavor to evade its application by giving
some explanation or interpretation of adverse facts,
consistent, if true, with innocence, but its force is com-
monly aggravated by the improbability or absurdity
even of such explanations, or the inconsistency of them
with admitted or incontrovertible facts.   All such
false, incredible, or contradictory statements, if dis-
proved or disbelieved, are not simply neutralized, but
become of a substantive inculpatory effect."   Refer-
ring to the famous Patch case, Mr. Wills says: "His
interference with one of the witnesses, his falsehoods
respecting his pecuniary transactions with Goom and
with the deceased, and his attempts to exonerate him-
self from suspicion by implicating other persons, all
these cogent circumstances of presumption tended to
show not only that the prisoner was the only person
who had any motive to destroy the deceased, but that
the crime could have been committed by no other per-
son.   Mr. Burrill in the second edition, 1868, quotes

approvingly the following language which he terms expressive: "All the acts of the party, all things that explain or throw light on those acts, or the acts of others relative to the affair that come to his knowledge, and may influence him, his friendships and intimacies, his threats, the truth of his discourses, the falsehood of his apologies, pretenses and explanations, his letters, his speeches, his silence, when he was called to speak, everything which tends to establish a connection between all these particulars, every circumstance, precedent, concomitant and subsequent become parts of circumstantial evidence.

In connection with this objection was the exception to the admission of this shirt in evidence. The fact that it was not found in the house for two months or more after the murder, and that the house was open for some length of time prior to the finding of the shirt, and was not occupied, did not make the testimony irrelevant or improper. The circumstances under which it was found and its location rendered it highly probable that it had lain there in concealment from the time of the murder. It was put in evidence that the defendant Jenkins had occupied the house after the murder and at the time of the murder, that the shirt was exhibited to him, and that he neither admitted nor denied that it was his, but said it might be his. Whether or not the shirt belonged to Jenkins or McRae was not the question. It was found on their premises within a comparatively recent period after the murder. It was under a plank with a box on the plank. It was found by accident, and the possibility that it may have been put there for the purpose of throwing suspicion of guilt on one or more of his defendants, did not render it inadmissible as testimony. If this testimony was inadmissible, then scarcely any

evidence in a case depending upon circumstantial evidence would be admissible. If it was not Jenkins' or McRae's shirt, it was in the power of the defendants to rebut the testimony. It was found on their premises under circumstances indicative of guilt and inconsistent with innocence. Mr. Wills in the portion of his treatise relating to identification of property, page 130, says: "It is not, however, necessary that the identity of stolen property should be invariably established by positive evidence. In many cases identification is impracticable; and yet the circumstances may render it impossible to doubt the identity of the property or to account for the possession of it by the party accused upon any reasonable hypothesis consistent with his innocence."

There was nothing in the case to even raise the presumption that this was simulated testimony. The witness who found the shirt was the mother of one of the defendants, and could have no motive or reason to enter into a conspiracy to fasten the crime upon the defendant Jenkins, especially when she knew or must have known that her son was with Jenkins on the night of the commission of the murder and occupied the same premises with Jenkins, sleeping under the same roof with him.

Suppose that it had been a 32-caliber Smith & Wesson revolver that had been found on these premises concealed under this plank? It would have been impossible to have satisfactorily proven who the weapon belonged to, and yet the fact that it was found on the premises occupied by the three defendants, and that all the bullets taken from the bodies of the deceased were 32-caliber bullets, would have combined to have rendered the testimony of its finding and the introduction of the pistol as admissible as part of the chain or

strand of circumstances against the accused. In connection with this shirt the objection of defendants' counsel to Mr. Hurry, chemist, testifying as to what he found on the shirt, can not be sustained. The shirt had been identified by Mrs. Clinton as the one she had found in McRae's house, and had turned over to the sheriff in the presence of Mr. Raulerson, then into the hands of Judge Beggs, State's attorney, who had given it to the chemist for analysis. All the objection to the admission of this testimony was certainly unsupported by any rule of law of which we have knowledge.

That it was a shirt found in McRae's house had been conclusively proven, and consequently it was proper for the witness to testify what the result of his examination was, and this testimony was further supported by that of Mr. Kurtz the sheriff, who identified the shirt as being the one that Mrs. Clinton had given him and being the same shirt that he had carried to Mr. Hurry for analysis. The result of his analysis showed that there were blood stains upon the article of clothing and that they were mammalian and not reptilian blood.

It is scarcely necessary to say that this testimony has always been held admissible, nor can the fact that it was not conclusively proven to which of the defendants, if any, the shirt belonged, effect its relevancy.

Further on in the testimony Mr. Broward was asked if he knew of Jenkins trying to get money or giving an order for any money to any lawyer or any other person while he was confined in jail at Jacksonville. This was objected to on the ground that it was immaterial and irrelevant. The judge overruled the objection on the ground that in case of circumstantial evidence it was a difficult matter to tell what relevancy the testimony would have, and that if afterwards it appeared to be irrelevant, counsel could move to strike

JANUARY TERM, 1895.                    767

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

it out. The witness went on and testified that Judge Welborne came down to the jail one morning and wrote an order, which he asked Broward to witness, for $50.00, in the shape of a draft on Dr. McRae, the father of the codefendant McRae. It seems to us that this was certainly relevant testimony. Here we find a negro drawing on the father of his codefendant for a large sum of money. This incident, taken in connection with the secret letter written by him to Dr. McRae and sent surreptitiously out of the jail asking for money, referring to the murder and pledging himself not to implicate his codefendant in any way, was certainly a suspicious circumstance and proper to be submitted to the jury for what it was worth. The close relationship of Dr. McRae to the codefendant, the different positions in life occupied by them, and the secrecy and concealment in the matter of the letter, are all alike suspicious circumstances which render the testimony relevant. It was not shown that Dr. McRae was indebted to the defendant Jenkins in any money. There was no necessity for any concealment of the letter smuggled out of the jail to Dr. McRae. If Jenkins was innocent and there was not something to demand concealment in his transactions with the friends of the accused, then the whole of this testimony was certainly relevant to go the jury for what it was worth. As Mr. Wills says, page 82, "In the endeavor to discover the truth no evidence should be excluded." Mr. Wills further says, that "Any acts clearly brought home to the prisoners *or his agents* are of a most prejudicial effect as to on his part and assurances of guilt and a desire to evade the pressure of facts tending to establish it."

When the relationship of Dr. McRae and the codefendant of Irving Jenkins is considered, surely the

acts of Jenkins in drawing and calling on Dr. McRae for money, as well as the notable fact that in the letter secretly smuggled from the jail to Dr. McRae reference is made to this very crime, constitute circumstances which the jury are entitled to have put before them.

James A. Ball being called upon to testify was asked by counsel for the defendants if he could remember all that Jenkins had stated in his testimony at the cororner's jury. He replied that Jenkins may have made some statements that I could not recollect now," whereupon counsel for defendants objected to the admission of the testimony unless the witness could recollect every portion of it. In answer to a question from the court the witness stated he could give a substantial statement of what Jenkins had said at that time, whereupon the testimony was admitted, and the defendant excepted. Even if the witness could have remembered only a portion of this testimony it would have been proper to have admitted it. It would be monstrous to say that because a witness could not recollect substantially everything that was said, he would not be competent to testify as to what he remembered. After a lapse of two years, it would be perhaps impossible for any person to recall what had been said in a conversation, but if he can remember substantially all that was said, and especially the most important parts, the testimony is certainly admissible.

In the case of Wright vs. The State, 35 Ark. 639, this very objection of counsel was brought before the court, and it was there held that, "The fact that the accused in a conversation with witness said something which the witness could not remember, will not exclude his testimony as to what he does remember." See 8th So. Rep. 274.

There seems to have been in the mind of counsel for the defense an impression that the declaration of third persons concerning the murder even if made in the presence of the accused, and the declaration of the accused to third persons were all irrelevant and improper testimony. We have made a careful investigation into the authorities and in every case we find such testimony excluded only when the declarations were made in the absence of the accused. On examination of William Baxter, Jr., as to a conversation he had with the defendant Marion Clinton, the witness stated that Marion Clinton had made a certain statement to him regarding McRae, and this was objected to by counsel for the defense because McRae was not present. In a joint trial of two or more defendants everything said by a co-defendant of the transaction under investigation is part of the res gestæ. If three persons committed the crime and one of them purported to have given an account of the transaction to a witness, it will be impossible to give the statement before the jury without his referring to the other participants in the crime. It all formed part of a conversation the witness had with Clinton concerning this murder and the State had a right to put the whole of the conversation in. It was not evidence against McRae nor was it introduced as such, but was intended to show that, taken in connection with the other evidence, Marion Clinton had a personal knowledge of the transaction; that he was not narrating it as what McRae said, but as something that he had himself witnessed. It will be remembered that the witness stated that Clinton had told him that McRae had made certain statements to him, Clinton being then on the ground at the scene of the murder showed to him (the witness) where Miss Bruce had

49

stood when she blew out the light and showed him the position McRae had stood. not stating that McRae had told him where the two stood but pointing out the location as though of his own personal knowledge, thereby raising the presumption that McRae had told him that he had seen Miss Bruce blow out the light to be untrue and that he was present and knew where both McRae and Miss Bruce stood and what they did. How could Clinton have known the relative positions of McRae and Miss Bruce? He stated to Mr. Baxter that McRae told him he saw Miss Bruce blow out the light. They were then on the ground at the scene of the murder and the accused immediately pointed out to witness where McRae stood and where Miss Bruce stood. The testimony was clearly admissible as laid down in Abbott's Trial Briefs, sec. 644: "It is competent to prove against the accused any statement as matters presumably within his knowledge, made in his hearing, tending directly or indirectly to implicate him; and thereupon to show his demeanor, his silence or his responses, as evidence of his acquaintance in the statement."

John C. Dyal was introduced for the purpose of stating a conversation he had with Marion Clinton, all three being present. The defendants' counsel objected to the witness testifying as to what Wash Clinton said, although what Wash Clinton said to his brother was a part of the res gestæ of the case, as it certainly effected and controlled the action of the defendant Marion Clinton. The spring term of the court of 1892 was about to be held and in his presence Marion Clinton's brother told him to stay there at the house of witness until he (Wash) went over to Goodrich's to see what Goodrich and Joe Bryan were talking about. Marion remained and on his brother's return about half

an hour afterwards, he, Wash said, "I know what they are up to here; they are after us and we had better go home, or no we had better go into the swamp until after court is over." Marion and Wash then went off some distance and had a talk which witness did not hear; witness, however, testified that he advised Marion and Wash not to go into the swamp but to go to court if they were summoned. We think that this testimony is perfectly relevant, Marion being present and his actions being controlled by what his brother told him. It would seem from the evidence that Goodrich and Bryan were interested in ferreting out the crime, and we find the defendant's brother in the presence of witnesses telling the defendant to stay at witness' house while he went over to eavesdrop and ascertain if he could what Goodrich and Bryan were up to, and that on his return he expressed the opinion that they were after them to carry them to DeLand and suggested that they go into the swamp to avoid going to DeLand. It must be borne in mind also that another witness (Baxter) testified as to the anxiety of the defendant Marion Clinton to tell something that evidently weighed upon his mind; that while talking to him this same brother, Wash Clinton, came up and told him he had better keep his mouth shut. It was clearly a part of the res gestæ of the case; as the result of the advice of the witness, the defendant Clinton as well as his brother did not go into the swamp.

In the case of the People vs. Foley, 64 Mich. 150, it was held that, "On a trial for an indictment for murder testimony showing a statement of the wife of the accused made in the presence of the accused immediately after the death of the deceased was discovered at the house where it occurred, the testimony of such statements being necessary to explain the statements

of the accused are properly admitted as part of the res gestæ." In McGill vs. The State, Texas, 8 So. Western, 661, the court held, "That the deceased body having been found not far from a pool of water in which his coat was found, the testimony of the witness that he went to the place pointed out to him as the place where the body was found and there found among many shoe tracks, one leading to the water made by a run down and patched shoe, such as that worn by the defendant, is relevant, however remote." In the case of Miller vs. The State, Miss. 8 So. 273, the court held that, "The State's witness was properly allowed to testify that the deceased wife in the presence of the accused stated that the accused had killed her husband; that he had told her so, that he had told her he would kill her if she disclosed it; that he loved her and would take care of her, and that the accused replied that he would tell what he had to say at the magistrate's court." See 94th Cal. 255.

In the case of The State vs. Crafton, Iowa 56 N. W. 257, the court held that, "On a trial of a defendant for murder evidence of what was said in defendant's presence at the time of the homicide immediately after it occurred was competent over defendant's claim that he was in such a disturbed state of mind that he did not hear it, he being within hearing distance, and there being no evidence that his sense of hearing was impaired, it must be presumed that he heard what was said."

The statement of the accused Clinton to the witness was clearly an attempt to exculpate himself and inculpate his co-defendant.

As Mr. Wills, in his works on Circumstantial Evidence says, page 83, 6th Am. Ed.: "Amongst the most forcible of presumptive indications may be mentioned,.

JANUARY TERM, 1895.       773

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

all attempts to pollute or disturb the current of truth and justice, or to prevent a fair and impartial trial, by endeavors to intimidate, suborn, bribe, or otherwise tamper with the prosecutor or the witnesses or an officer or minister of justice, the concealment, suppression, destruction, or alteration of any article of real evidence; any of which acts clearly brought home to the prisoner or his agents, are of a most prejudicial effect, as denoting on his part a consciousness of guilt, and a desire to evade the pressure of facts tending to establish it." On page 66–67, Mr. Wills says, "So natural and forcible is this rule of presumption that the guilty are instinctly compelled to endeavor to evade its application by giving some explanation or interpretation of adverse facts consistent, if true, with innocence; but its force is commonly aggravated by the improbability, or absurdity even of such explanations or the inconsistency of them with admitted or incontrovertible facts. All such false, incredible or contradictory statements, if disproved or disbelieved are not simply neutralized, but become of a substantive inculpatory effect." And on page 46, Mr. Wills says: "When an act is of such a nature as not necessarily to imply a guilty intention, and such intention is the specific point in issue, then the evidence of declaration by the party or of collateral circumstances, may be of the last importance, as explanatory of his motives and purposes. In regard to declarations referring to former and existing facts, Lord Chief-Justice Eyre said that such declarations are the explanation and connection of those facts which serve to make them intelligible. What a prisoner has said respecting a particular fact is admissible evidence, not in the nature of a confession, but in evidence of the particular fact, and such declarations are therefore receivable in all cases whatever, in order

to explain and to establish the state of any matter or fact which is in dispute or the subject of enquiry before a jury.

In Burrill in Cir. Ev. the following language is quoted approvingly exceeding the range that went to show in evidence: "All the acts of the party, all things that explain or throw light on those acts, all the acts of others relative to the affair, *that come to his knowledge* AND MAY INFLUENCE HIM."

And Mr. Starkie, page 486–7, lays it down that "There are no existing relations natural or artificial, no occurrences or incidents in the course of nature or dealings of society which may not constitute material proof and become important links in a chain of evidence." It was given in evidence that Marion Clinton had previously stated that he had been to the scene of the murder that morning and had first discovered the tragedy, when in point of fact he could not have been there that morning first, as he certainly had not gone with the defendant Jenkins, he not being in the boat with him when the two fishermen met Jenkins on the river.

His statement that McRae had told him to say he saw Miss Bruce blow out the light was not testimony against McRae, but is admissible as part of the testimony against himself when taken in connection with his pointing out to the witness at the scene of the murder where McRae stood and where Miss Bruce stood. If he knew where both stood, then it was not necessary for McRae to have told him that he saw Miss Bruce blow out the light, as he must have been there, and if he knew where Miss Bruce stood he must also have seen her blow out the light. See State vs. Middleham, 62 Iowa 150.

JANUARY TERM, 1895. 775

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

The pistol being offered in evidence as the pistol seen and examined by Messrs. Dyal and Crouch, and offered for that purpose, was objected to by counsel for defense because it had not been connected with any of the defendants; it had however been identified by the witness Dyal as the same pistol he had seen at Crouch's, and was offered in evidence as stated by counsel for the State for that purpose only. It is true it had not been at that time connected with any of the defendants, but it was subsequently clearly connected with the defendant Marion Clinton; Hewitt testifying to seeing Clinton return this identical pistol on the morning of the discovery of the murder, a few minutes before the arrival of Jenkins at Crouch's. Indeed nothing was more clearly proven than the identity of this weapon as being the one that Marion Clinton obtained from Crouch and returned to Crouch on the morning that the dead bodies were discovered.

Objection was made by counsel for the defendant to Ball testifying as to what McRae said during the inquest. The witness was a member of coroner's jury, and this testimony was offered not as to what McRae testified to, and which was taken down in writing, but as to what McRae said during the period of time in which inquest was held. This testimony as afterwards appeared related to the underclothing of the defendant and was within a week after the discovery of the dead bodies. The witness testified that the substance of McRae's statement was that he had lost his underclothing; that it had disappeared; that he did not know what had become of the shirt, drawers and undershirt that he had worn at the time of the murder. Witness said that McRae stated he had changed his clothing on Sunday, being the day after the discovery of the dead bodies. We can not conceive in what

manner this testimony was irrelevant. Here was the defendant who had worn certain clothing on Friday or Saturday, and he a few days afterwards was unable to account for what had become of it. Other witnesses testified as to his not being able to account for his clothing. What had become of it was entirely a matter within the knowledge of the defendant; he had worn it; he had charge of it and control of it; he alone could tell what had become of it. The condition of the dead bodies, the brutal butchery that had taken place, all indicated that the perpetrators must have had their clothing spattered with the blood of their victims. The complete disappearance of this clothing, and the inability of the defendant McRae to tell what had become of it, was a circumstance of the highest significance and altogether inconsistent with any hypothesis of innocence. His very admission or declaration, his every statement in any way connected with the murder, was competent evidence and as part of the res gestæ of the case, and the testimony of Mr. Ball as to his declaration concerning this clothing was proper and competent testimony. In this connection we want to include the testimony of George Dimmick as to what he heard Clinton say in a conversation with Dr. Cowie. This was a declaration by the defendant Jenkins himself and was clearly relevant testimony.

Mrs. Bevill testified for the State and stated that she was acquainted with McRae; that a week or two after the murder he came to her house and a conversation occurred between her and the defendant in which McRae said he had met Mrs. Hatch at the bars on Friday morning early about seven o'clock, her little boy being with her; that she invited him to come over and he told her likely he would, but said that he got off and

thought over the matter, and knowing that Miss Bruce was scary kind of cranky, he decided not to go.

Q. Did he say how Mrs. Hatch was dressed? A. He did not say how she was dressed at the bars, but he remarked that she had a red skirt, never would forget her red skirt and white waist. Q. She had on? A. Never said that she had it on that morning. Q. What did he say about the red skirt? A. He just simply said he never would forget it, always be familiar to him, that was one thing he wouldn't forget, he said he wouldn't forget the red skirt and white waist. Q. Who had the red skirt and white waist? A. Mrs. Hatch, but he didn't say she had it on that morning. Q. Did he say how it looked to him, how it seemed to him? A. No, sir, that is just what he said, that he wouldn't forget. Q. Never would forget the red skirt and white waist? A. Yes, sir. Q. Did you have any further conversation with McRae in reference to this murder, Mrs. Bevill? A. No, sir, not that I recollect of; I can't recollect that I did at this time. Q. Did McRae at any time tell you where he was on Friday night? A. He said he was at home. Q. Well, if you can recollect, state what he said about it? A. Recollect, you say, what he said. Yes. A. Well, I don't believe I can state it. Q. Did he state what hour he got home that night? To this question the defendants' counsel objected.

We do not believe that there is any matter of law better settled than that the party introducing a witness has a right to put questions tending to refresh the mind of the witness.

In his first testimony, before the coroner's jury, McRae had stated that he and Clinton arrived at the house about eight o'clock that night; so did Marion Clinton. In their testimony before the grand jury the

hour was changed to nine o'clock. The question there-
fore was eminently proper, and that it refreshed the
memory of the witness is seen from the answer, which
was, "Well as I can recollect about eight o'clock,"
thereby showing that immediately after the murder
the defendants all fixed the hour of their arrival at
McRae's place at about eight o'clock.

During the examination of John Pell, who testified
that he was a brother-in-law of the defendant Clinton,
this question was put: "What time was it Saturday
morning when he called, was it daybreak? A. No, it
was before day. To this question and answer the de-
fendant objected because said question is leading. In
what way was it leading? He could have answered it,
it was daybreak, or have answered as he did, it was
before day. The question did not suggest the answer,
neither was there likely to be any communication be-
tween witness and counsel, he being naturally a reluc-
tant and unwilling witness, and the testimony given
in answer to the question being absolutely without
injury to either of the defendants.

On the State offering the evidence taken before the
coroner's jury and also the grand jury by the defend-
ant McRae and Clinton, the defense objected and ex-
cepted to the ruling of the court admitting the testi-
mony. In the matter of admitting the testimony taken
before the coroner's jury at a preliminary examination
this question has been settled in this State, in the case
of Newton vs. The State, 21st Florida, page 53.

As regards the testimony taken before the grand
jury, Judge Beggs, State's Attorney, was put upon the
stand and testified that he was State's Attorney for the
Seventh Judicial Circuit of Florida; that he was pres-
ent at the taking of the testimony; that he had warned
the accused that they were not compelled to testify;

that they voluntarily testified in spite of the warning; that he took down the most of it in writing, himself; that that portion which he did not himself write, he saw taken down and watched the writer while he was taking it down, and that the testimony offered was the testimony of the accused. At this time neither McRae nor Clinton stood charged with this murder. That they were suspected of participation in or knowledge of it is quite probable, but this fact did not render the testimony inadmissible.

·In the case of Scott vs. The State, 5th S. W. 142, it · was held that "A witness may be impeached by showing that he made his statement under oath before the grand jury inconsistent with his evidence on trial.

In the case of the State against Moran, Org. 14th Pacific 419, it was held that, "On a trial of murder the evidence of a grand juror, and statements made by the defendant to the grand jury, which indicted another person of the crime of which the defendant so charged, is admissible."

And so likewise it was held in the case of the United States vs. Kirkwood, Utah 13, p. 243, that "Upon a trial of one for unlawful cohabitation the testimony of one of the grand jury that the indictment, that accused had made a voluntary confession before the grand jury, is admissible." In this case it appeared that the charge was being investigated before the grand jury and the defendant though told by the prosecuting attorney that he could not be compelled to give his evidence, expressed his willingness to testify, was sworn and confessed the charge.

While McRae made no confession, he was warned by the State's attorney that he was not compelled to testify, but expressed himself willing and ready to do so and did testify.

780  SUPREME COURT.

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

In the case of The State vs. ————, 51st Iowa N. W. 1159, the court held that "Where the defendants voluntarily appear before the grand jury and testify, after being advised by the foreman that they were not required to do so, it was not error to allow the jurors to testify as to statements made by the defendants before them." See also 85th Iowa, 4.

The gist of the objection to this testimony was based upon the fact that the State's attorney was not a member of the grand jury. He is, however, expressly authorized by the laws of this State (sec. 2807 Re. Statutes) when required by the grand jury to attend for the purpose of examining witnesses in his presence. His presence in the grand jury room, examining the defendants was a part of his official duty, rendered mandatory by the laws of the State. He was empowered by the law to examine the witnesses; he examined the defendants and took down their testimony in writing, or saw it done, he heard what they said, and warned them that they were not compelled to answer. There can be no question of the admissibility of this testimony.

As regard the admissibility of testimony taken before a coroner's jury, in addition to the authorities quoted, in the case of Newton vs. The State, there are numerous additional authorities sustaining the admissibility of this testimony. Neither of the defendants at the coroner's inquest were charged, or even at that time, as testified by the jurors, suspected of the crime.

In the case of Hill vs. The State, (Miss.) 1st Sou. 494, the court held that "Where the accused testified as a witness in his own behalf in a preliminary trial before a justice of the peace, and his testimony is reduced to writing, such testimony may be used against him on his trial under an indictment.

In the case of State vs. Taylor, 13th Kansas, p. 550, the court held that "In a prosecution for murder, the testimony of the defendant given at the coroner's inquest, reduced to writing and signed by him, is admissible in evidence although the defendant did not testify on trial and it does not appear that such testimony was not given voluntarily."

In the case of State vs. Lewis, 3d La., S. 343, the court held that, "The declarations of the defendant voluntarily made during the preliminary examination of another person. are admissible against him in the prosecution of himself for the same crime."

Even if the defendants have not been charged with the murder, the admission of their testimony before the coroner's jury would have been proper.

In the case of Lyons vs. the People, 27th Ill. N. Y. 667, it was held that, "Where a person under arrest for murder voluntarily testifies before the coroner's jury and his testimony there is not contradicted by him on his trial, the testimony so given by him is admissible in evidence against him."

In the case of Newton vs. The State, 21st Fla., p. 75 et seq., .the court sustained the action of the court below in admitting the testimony of Newton as taken at the inquest, said, "The general rule is that, what a party says in relation to the offense is admissible in evidence against him whether on oath or not, provided always, he is not at such times charged with the commission of the crime, and such statement is voluntary. Adding on the subject of the admission of Newton's affidavit for continuance, "We can not see that it can be properly excluded and find no error in the court allowing it to be read to the jury as evidence in the cause, and quoting approvingly the case of the People vs. McMahon, 58 N. Y., and Cooper vs. The State, 20th

Ark. 53.    See 50 Wis. 218; 13 Kansas 447; 57 Wis. 45; 59 Ga. 737; 48 Wis. 271; 60 Ga. 258; 48 Wis. 281.

Objection was made to the witness F. L. Russell, testifying to what he found under the microscope on the handle of the pistol: "The evidence is secondary, that if there is a name written by any one, that the best evidence is the party who put it there and that until it is shown that they can not produce the party who put it there, it is not evidence for the purpose of identifying the pistol and it makes the jury scientific experts."

It was in evidence that the pistol originally belonged to a man named Brunson, but it was not sought to be proven that Brunson scratched his name on the handle, all that was desired was to prove that under the new coat of varnish, the microscope revealed the scratching of certain letters, which put together would spell the name of Brunson. It was not attempted to make scientific experts of the jury.

In the case of Newton vs. The State, our Supreme Court held that it was proper to introduce a box of cartridges of a certain calibre in evidence and to submit them to the jury for their examination, it being shown that a bullet of the same calibre had been taken from the head of McMillan."

Mr. Burrill, p. 660 says: "Again, there are some marks upon articles believed or shown to have been used as instruments of crime, which enable the inference of identity to be drawn by any person to whom they may be exhibited, such as the owner's name, written, scratched or engraved upon them. But a very minute examination is sometimes necessary to the discovery of such marks of ownership. In an English case (quote Regina vs. Sawyer, Maidstone Spring Assizes, 1839) where a razor was found in a wood near a

JANUARY TERM, 1895.     783

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

spot where a murder had been committed, no means of its identification were visible until an optician showed satisfactorily to the jury the name of the pris-oner scratched in rude letters on the handle.''

In this case it has been proved that the pistol in evidence had belonged to a man named Brunson and from him had passed into the possession of Crouch, and that Crouch had given it to one of the accused, Marion Clinton, a few days before the discovery of the dead bodies, and which was returned to Crouch on the morning of the discovery of the dead bodies. It appeared from the testimony that the pistol had been renovated since the discovery of the murder and re-varnished, and that on investigation with a microscope certain letters appeared under the new coat of varnish on the handle of the pistol. It was proper for the witness to testify what he discovered under the varnish by the aid of the microscope, as the testimony tended to prove that it was the same pistol the witness Hewitt had testified to. The pistol was then given to the jury and examined by the members through the micro-scope.

The next exception we find is to the fitting of the bullets taken from the dead bodies, into the pistol. The pistol having been fully identified as the one that Marion Clinton had in his possession and fully proven to be a 32-calibre pistol and the bullets taken from the dead bodies having been fully proven to be 32-calibre bullets, it was perfectly competent to complete this part of the evidence by fitting the bullets in the chambers of the revolver.

In what manner this was objectionable testimony we are unable to imagine. The ground of objection that it was not proven in evidence that the bullets had gone out of the pistol was certainly original. The bullets

had certainly gone out of some pistol or they could not have entered the heads of their victims. Whether they came out of that particular pistol or not was a question to be determined by the jury and the circumstances adduced in the evidence and one of those circumstances was the fact that the pistol proven to have been in the possession of one of the defendants, was of a certain calibre, that the bullets were of the same calibre, and that the bullets fitted the pistol in question.

In the case of Newton vs. State, 21st Fla. 85, the Supreme Court of this State sustained the putting in evidence by the State of a full box of 38-calibre long central fire metallic cartridges, giving to the jury one of these cartridges, together with one of the cartridges taken from the revolver to compare. The court stated "If not experts the jury were men qualified by law to be trusted with the comparison of cartridges, and the evidence could in no way be prejudical to the rights of the accused." In the objection here made to the fitting of the bullets taken from the dead bodies into the pistol, the ground was that it was not proven in evidence that the bullets had come out of that particular pistol. From the very nature of things it was impossible to give this proof, but it certainly was competent to show that the bullets taken from the dead bodies fitted the pistol that was proven to have been in the possession of one of the accused continuously for days prior to the murder and up to the morning of the discovery of the murder.

The objections of the defendants to the charges of the court were embraced in the following charges: "First, that in a case of circumstantial evidence it is not necessary that the proof shall be conclusive; that it is sufficient if the jury believe from all the facts

and circumstances of the case that the accused are guilty and there is no reasonable doubt in their minds of this fact. If the jury think that the facts in this case are all consistent with the supposition that the prisoners are guilty, and cannot reconcile the circumstances produced in evidence with any other supposition than that of guilt, it is their duty to find them guilty. All that can be required is not absolute positive proof, but such proof as convinces them that crime has been made out against the accused."

This charge is taken almost verbatim from the charge of Baron Park in the case of Regina vs. Tawell. The learned judge said: "This being a case of circumstantial evidence, I advise you as I invariably advise juries, to act upon a rule that you are first to consider what facts are clearly, distinctly, indisputably proved to your satisfaction, and you are to consider whether these facts are consistent with any other rational supposition than that the prisoner is guilty of that offense. If you think that the facts in this case are all consistent with the supposition that the prisoner is guilty, and can offer no resistance to that, except the character the prisoner has borne, and accept the supposition that no man would be guilty of so atrocious a crime as that laid to the charge of the prisoner, that can not much influence your minds; for we all know that crimes are committed, and, therefore, the existence of the crime is no inconsistency with the other circumstances if those circumstances lead to that result. The point for you to consider is, whether attending to the evidence, you can reconcile the circumstances adduced in evidence with any other supposition than that he has been guilty of the offense. If you cannot, it is your bound duty to find him guilty; if you can, then

50

you will have to give him the benefit of such supposition. All that can be required is not absolute positive proof, but such proof as convinces you that the crime has been made out.

And in the case of Regina vs. Humphries, Lord Meadowbank said: "I must tell you that the learned counsel of the panel stated the law incorrectly when he said you must have decisive, irrefragible and conclusive proof of every point in a case like the present before finding the instrument to be forged. The law is quite the reverse; you are to take all the evidence together, and you are bound to consider whether it amounts and comes up to affording a moral conviction in your minds equivalent to the positive and direct proof of a fact."

We have searched the books in vain for any decision conflicting with the law of the case as laid down in this charge, and can not find it.

We find the charges quoted above referred to again and again, and sustained by the adjudication of almost every appellate tribunal in the United States.

The next error claimed in the charge to the jury is as follows: Second. "That in cases of this kind the conclusion to which the jury are conducted is that degree of certainty in the case that you would act upon it in your own grave and important concerns; that is, the degree of certainty which the law requires and which will justify you in returning a verdict of guilty, from all the facts and circumstances laid before them; that the inculpatory fact must be incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of their guilt. This is also taken almost word for word from the charge of Lord Chief Baron

JANUARY TERM, 1895.          · 787

Jenkins, McRae and Clinton v. The State.—Argument of Counsel.

Pollock in the case of Regina vs. Manning and Wife, and is certainly a charge favorable to the accused.

The next charge objected to as error, is as follows:

Third. "That the fact that unfortunate cases have occurred where innocent persons have been convicted upon circumstantial evidence should not for one moment enter their minds in the consideration of the evidence of the case; that unfailing assurance can not be invariably expected in the investigation of moral and contingent truths, nor can the fact that a few innocent persons have suffered warrant the jury in disregarding the circumstantial evidence and rejecting its weight and force; that to do this would be to permit the guilty man to escape and subvert the whole foundation for the administration of public justice.

It must appear to the court that this charge was asked for, as in fact it was, because of the argument of counsel for the defense to the jury based upon the existence of cases where innocent persons have been convicted of crime by circumstantial evidence, and the charge asked for and given is contained in the text of the argument both in Burrill and Wills on Circumstantial Evidence.

That this charge was called for by the language of the counsel for the defense is stated by the court in overruling the motion for a new trial, where the court said as follows: "So far as that charge is concerned and is objected to by Judge Foster, they are of consequence in the motion. It was at the request of the State, and while I do not recollect that it was dwelt on very largely as to the possibility of somebody else having committed the crime and the uncertainty of it; still I recollect that one of the counsel for the defendants did descant somewhat at length, and I thought with force too, that this being only a circumstantial

case, if the jury found these people guilty it would be
a very unfortunate thing if years afterwards some one
on his deathbed confessed the crime and showed that
they were innocent and convicted upon circumstantial
evidence.   I think Mr. McNamee made that in his re-
marks, and I thought it had effect, and when the State
asked that charge, it being proper, I did not see how
I could refuse it.

So likewise the error claimed in the charge of the
court as follows:

Fourth.   "That if, after consideration of all the facts
and circumstances narrated by the witnesses, the jury
are convinced to a moral certainty of the guilt of the
accused, it is their duty and right to find them guilty;
that the law requires from them a fearless performance
of their duty, uninfluenced by any sentiment or sym-
pathy either for the deceased or for the persons that
are accused of the murder.   If the jury believe from all
the facts and circumstances brought before them that
the charge of guilt is made out as against the accused
beyond a reasonable doubt, then they must find the
defendants guilty.

We certainly can not understand wherein there is
error in this charge, nor can we find the authority
which declares it such.

The charge is eminently impartial and just.   It tells
the jury that if from all the evidence before them, they
are convinced to a moral certainty of the guilt of the
accused, it is their duty to find them guilty, and that
in the performance of this duty they must not be influ-
enced by any sentiment of sympathy either for the
deceased or for the person that did the murder.

This charge is from the text in Abbott's trial briefs,
section 792, and is sustained in the following cases.
They are cited: McLean vs. The Com., 99 Pa. State

86, where the charge was in the language excepted to; Clifton vs. The State, 73d Ala. 473; Greene vs. The State, 38th Ark. 304; Preston vs. The State, 8th Tex. Appeal, 30.

And in the case of The People vs. Minisci, 12th N. Y. State 719, it was held that "Although proof of motive is of more or less importance in a case of purely circumstantial evidence, yet where the defendant is indisputable the perpetrator of the alleged crime there is no occasion for explaining the reason of his act. It is enough that the evidence does not absolutely exclude the existence of motive, as it may do, for instance by showing the accused to have been insane.

The next error claimed in the charge to the jury is as follows:

Sixth. " That the testimony in circumstantial evidence must be consistent with itself and incapable of any other hypothesis than that of the guilt of the accused to warrant their conviction, but it is not necessary for the State to make out or prove every minor fact in a chain of circumstances. It is sufficient if they connect and point to the accused and leave no reasonable hypothesis inconsistent with their guilt.

That this is the law and that it is correctly stated in the charge scarcely admits of argument. The charge is certainly favorable to the accused and correctly states the nature and force of circumstantial evidence.

This is the law as declared by all writers on circumstantial evidence and is almost the language of Wills and Burrill.

The next charge objected to is as follows:

Seventh. "If the jury believe from the evidence, beyond a reasonable doubt, that the said Wm. McRae on the twelfth of December, A. D. 1891, at and in the county of Volusia and State of Florida or any time

prior to the finding of said indictment unlawfully, feloniously and from a premeditated design to effect the death of one Adelaide Bruce in and upon the said Adelaide Bruce and did make an assault, and with a certain double barrelled gun did then and there unlawfully, feloniously, and from a premeditated design to effect the death of said Adelaide Bruce, strike and bear the said Adelaide Bruce and give her, the said Adelaide Bruce, in and upon her face and head one mortal contusion, bruise, fracture and wound, they will find the defendant, William A. McRae, guilty of murder in the first degree as charged in the fifth count of said indictment.

We are at a loss to see wherein there was error in this charge. Certainly if there was it must have been error without injury, as the jury did not find in the manner or on the count set forth in the charge.

The next exception to the charge of the court is as follows:

Eight. "On the one hand absolute metaphysical and demonstrative certainly is not essential to proof by circumstances. It is sufficient if they produce moral certainty to the exclusion of every reasonable doubt. This charge embodied the essence of the law on circumstantial evidence and does not need reference to authorities to sustain it. It is absolutely without error.

The next exception to the charge of the court is based upon the instructions to the jury after the jury had returned and announced that they had found a verdict of guilty. Their verdict was: "We, the jury, find the defendants guilty," etc., without specifying upon what count.

The court then addressed them as follows: Referring to their finding he said:   "It will have to be on one

count of the indictment.  You will have to specify
upon what count. of the indictment.  There are six
counts of the indictment:  My instructions are to find
them guilty on some count of the indictment.  Just re-
tire gentlemen.''

"Gentlemen of the jury read my instructions.
well, you should say: 'We, the jury, find the defend-
ants guilty of murder in the first degree,' if you so
find, as charged in a certain count in the indictment,
you should bring in a verdict of murder in the first de-
gree if you find them guilty of that.''

It is impossible to conceive in what manner the
court erred in this.  The jury had found a general ver-
dict of guilt against the defendants and appeared to
consider the general verdict sufficient.

The court instructed them to retire and find a ver-
dict upon some count and his language was simply an
instruction to them as to their duty in the matter.

The jury having retired, presently returned and
stated that they were somewhat confused as to what
the court meant as regards finding a verdict on a count,
whereupon the court said: "I said to you before, my
instructions say, that you should form your verdict,
if you find them guilty of murder, you find them
guilty of murder in the first degree, specifying the
crime, the names of the parties and on some count of
the indictment, whichever count you find them on, on
some count of the indictment.  You need not find, you
don't find on all the counts, but they are charged on
six counts, you are to find on any one count of the in-
dictment.''

Here again there was no error, it was simply instruct-
ing the jury as to their duty in the manner of finding
the verdict.  They had decided the accused were guilty

but they appeared to be confused as to the question of the different counts in the indictment.

The next error assigned is in the court permitting the attorney for the State when the jury came into the court for the second time, to state as follows: "If your honor please, the jury from the reading of the charge may not have comprehended, in the formal legal language used, the nature and character of each charge. For instance, if your honor has charged that if they believed that some one of the defendants struck the blow or fired the gun or cut the throats, or either, which inflicted death, and that the others were present aiding and abetting, then they should find a verdict saying: "We, the jury, believe John Smith guilty of murder in the first degree as charged in the 1st, 2d, 3d, 4th, or 5th count of the indictment as the case may be. Now I think that possibly sir, an explanation would tend by way of a supplemental charge as the court has a right to do, since the jury comes in to ask for explanation of instructions, might enable them to arrive at some understanding of the nature of the charge."

It is remarkable that when counsel made the objection to this language of counsel that they themselves were doubtful whether there was any error in the language as they made explanation setting forth that they did not know that there was anything imporper in it. In what way it was erroneous, we can not understand. It was suggested to the court for supplementary instructions to the jury and in no way effected or influenced the decision of the jury, which had already found a verdict of guilty of murder in the first degree against the defendants.

In reading the record showing what preceded and followed this language of counsel will explain the matter, and will show how utterly devoid of error or

objection the language of counsel was, especially when it is remembered that the jury had already found the prisoners guilty as charged in the indictment.

In the case of Cremes vs. The State, 28th Tex., Appeal, 516, the Supreme Court of Appeals held that, "It was not improper for the prosecuting attorney in his argument to comment on the fact that defendant's father was present during the trial and could have been called as a witness."

If this was not ground for reversal how much less was the language excepted to, which was simply a criticism by counsel; on the failure of the legislative body to perform its duty in protecting life and ferreting out crime.

In the case Frelinghuysen vs. The State, the court held that, "When counsel makes remarks which are unwarranted by the testimony and are calculated to prejudice the jurors, the attention of the court should be called to the objectionable language and the ruling obtained, at the time the words are used or when the jury is charged.   An exception to the remarks of counsel simply is insufficient to raise the question on appeal."

In this instance not even an exception was taken to the language of counsel.   The language could in no way have prejudiced the defendants as it was legitimate comment coming from the testimony, and as was determined in the case of Walker vs. The State, 28 Tex. 503.   Even if the remarks by counsel for prosecution were improper and uncalled for they were not ground for reversal, where they could not under the circumstances have been prejudicial to the defendants." Besides it is difficult to say what right of comment counsel would have if the objections here made were sustained.

The counsel for defense did not except to the lan--guage of the attorney first objected to, and as regards the last objection, it was not sustained by the court, the language now assigned as error never having been excepted to at all.

In the case of Whillingham vs. The State, 21st Fla. 727, the court says: "It might appear from the record in the bill of exceptions that the associate counsel used certain language on which the fifth assignment of error is based, and that the prisoner's counsel excepted to that language of the said associate counsel. There was no application to the court to stop said associate counsel, or to charge the jury with reference thereto. There was no exception to any action or failure to act of the court. The prisoner's counsel, it appears, attempted to make a point for appeal by accepting to the language of said associate counsel, without giving the court an opportunity to correct the matter if it required correction. No exception lies to language of counsel. An exception will lie to the action of the court, if the court endorses the jury, or in their hearing, language of counsel which is highly improper and to the manifest injury to the party excepting, In that case the exception will lie to the action of the court in refusing, on request properly to charge the jury with reference to such language; but no party can fix an exception on intemperate language of counsel, as soon as uttered, and appeal on that, making no application and making no application and giving no opportunity to the trial court to correct it. An exception can be taken only to some action of the court. An exception can not be taken to the testimony of a witness, much less the language of counsel; if the court, after objection, improperly admit a witness to testify, or if the court on application refuse to strike out the testimony improp--

erly given by a witness, before there was opportunity for objection, such action of the court is ground for exception, but the language of witness is not ground of exception. I have examined every case which I have been able to find on this subject and in every one of them, with a single exception hereafter explained, the error assigned was some action of the court in refusing to stop counsel in the use of improper language or in refusing to charge the jury correctly thereon. In no case that I have been able to find, has the language of counsel itself been found or held to be ground of exception or reversal, with the single exception above alluded to, viz: The case of The State vs. Balch; and there the language of State's attorney was itself made a ground of exception and error, apart from the action of the court by peculiar language of the statute.

The next objection is that the court erred in permitting counsel for the State in its argument to the jury to use the following language:

"I go further and say if these murderers are not convicted, the State of Florida is largely responsible for the failure of justice, in that the State has failed and refused to furnish to its officers the adequate means to make conclusive every possibility, not merely probability, but every possibility; and when the man who speaks before you succeeded in passing in the Senate of Florida, a bill to furnish the State of Florida with the means for investigating all secret crimes, it was laid on the table in the House, and that man who opposed that bill in the House was a member of the Legislature from Orange county, who lives in Sanford."

Not one word of that language was in any way prejudicial to the accused; on the contrary it was a decla-

ration to the jury that the proof could not be made more conclusive and the ends of justice further subserved had the guilty man been placed at the disposal of the officers of the State. It was not calculated to prejudice the accused; it inflicted no injury upon them, it was not attempting to introduce any testimony against them not placed before the grand jury under oath. It was simply a comment by counsel on the failure of the Legislature to provide the means for thorough investigation of secret crime and did not call for either objection or action on the part of the court. If even the language of counsel could by any possibility be construed as meaning that had the means been furnished to the officers of the State, the State's case against the accused could have been strengthened, such language would not have been ground for reversing the verdict.

In the case of Hudson vs. The State, 28th Texas, 323, the court held that, "The remark of the prosecuting attorney in the argument that he could strengthen the State's case by an absent witness is not reversable error where the testimony given is amply sufficient to sustain the verdict." In the case of The State vs. Flewens, Mo. 13, S. W. 937, the prosecuting attorney in his closing remarks said: "Gentlemen, you know these assaults with intent to kill are becoming too common in this country and in southeastern Mo.; on the appeal, the Supreme Court of Mo. held that the language furnished no ground for reversal of the judgment convicting the defendants of such an assault."

In the case of Saunders vs. the People, 16th Ill., N. E. 81, the State attorney in the prosecution for perjury for making false affidavits for continuance, told the jury that, "Criminals often escape their just deserts by such false affidavits for delay as the prisoner was

then making and that it was their duty to put a stop to that kind of work."

He also referred to the destruction of the court house in Cincinnati a few years ago as an illustration of the effect of public indignation when aroused by the unjust escape of prisoners and criminals for perjury offenses: Held, That these remarks are not of such a character as would require a verdict of conviction.

Counsel for the defendants claimed ground of error as to the language used by counsel to the jury in his argument in relation to the pistol with which the murder was claimed to be committed. It will be noticed that when counsel began commenting on this weapon he was interrupted, and the court sustained the objection and did not permit him to exhibit the pistol and to show the changes that could be made whereby it could be reduced to the condition that the witness Hewitt testified it was in, with the automatic apparently broken.

We contend here that the court erred in not permitting counsel for the State to show the jury that the revolving spring of this pistol could not have been broken at the time of the commission of the murder. The pistol was in evidence as the pistol which Clinton had in his possession the morning of the discovery of the dead bodies and for some days prior thereto. It had been pulled to pieces before the jury; it had been put in evidence, and we insist that counsel should have been permitted to have shown to the jury that instead of being broken it was likely that there was nothing but a slight derangement of the spring, although even if disarranged it was proven that the pistol could be fired. However the court refused to permit counsel to demonstrate the fact before the jury, and counsel continuing his argument on this subject

confined himself to a supposition, using the following language: "I will show you then, gentlemen of the jury, what I have a right to show you; there is not one word of evidence before you to show that that was the one that was broken, and I say to you that the evidence is it could be fired; it could shoot.  I say to you that you have a right as you have not one word of evidence except that it could fire and that it could shoot.  Suppose, gentlemen of the jury (and if I am not right, I ask the court to warn me), suppose, if your honor please, that the boy had got the pistol and had discovered it was not broken or examined it to see what was the matter with it, and had found it was only because the spring had been shoved up against there, and not because it was broken.  It could have been fired anyhow, and the only point they attempt to make is that it would have taken so much time to have turned the cylinder, but it could have been fired.  And so, gentlemen, of the jury, I charge that that pistol, that identical pistol, that identical weapon, that identical 32-caliber center fire revolver, and, gentlemen, every bullet taken from the heads of these unfortunate victims were center fire 32-caliber bullets.  Gentlemen of the jury, that pistol has been put before you in evidence, and when that was put in evidence you were shown that it could be fired; I show you now that it can be fired again.  Now what if the defendants discovered that there was nothing wrong with the pistol except the derangement in its interior part that he using it would leave it as Hewitt testified it was, and saw on looking inside of it that it was not broken.  Would not that tell the story of the use of the pistol of that fatal Saturday morning at three o'clock?  Would not that tell the story of why Dr. Bevill heard two shots at intervals, and two shots in rapid succes-

·sion, then two shots at intervals, one coming from the 32-rim fire revolver in the hands of Mrs. Hatch and five coming from the chambers of that revolver."

The counsel then went on with the pistol indicating how the witness Hewitt said it had to be done for it to be fired, continuing his argument upon the supposition that the pistol had only been temporarily displaced when Hewitt had it and that the spring was not broken. The report of the language used by counsel is so disconnected that we might claim no damage whatever was done to the accused, and it certainly reads most incoherently, but it in no way injures the accused; beside, we desire to call the attention of the court to the fact that nowhere did counsel object to this argument or question or take any exception to it at the time it was uttered. It will be noticed that so much as was said was in reply to the argument of the defense, that if the pistol had not been broken as was proved, the shots could not have been fired from it as rapidly as the witness Bevill testified.

In the case of The State vs. Shores, W. Va. 7, S. R. 413, "An attorney for the State in his argument that if the prisoner and his associates were capable of committing the offenses shown to have been committed by them on a certain night, and as admitted by their counsel in his argument, then it followed that they were capable of committing openly the crime of which they stood indicted. Held that the statement was not improper, being made in reply to the argument of prisoner's counsel as to the unreasonableness of the State's theory that the prisoner would commit the crime charged as shown by the evidence.

The court should not interfere with the finding of the jury in a case of this kind, and with the evidence

placed before them.    Preston vs. State, 4th Texas.
App. 39; Greggs vs. State, 59 Ga. 738; Kelly vs. State,.
49 Ga. 12.

MABRY, C. J.:

In December, 1891, Francis Joseph Packwood, with·
his sister-in-law, Miss Adelaide Bruce, and his four-
year-old son, lived on the Hillsboro river in Volusia
county, Florida, about half way between the towns of
New Smyrna and Oak Hill.   Mr. Packwood's place
was somewhat isolated, being immediately on the river·
and about one mile east of the public road between
the towns mentioned, with a road extending from the
public road to the place on the river.   On Thursday
preceding the 12th day of December, 1891, Mr. Pack-
wood left his place to visit Orange county, and, as was.
his custom on remaining from home over nights, he·
induced a Mrs. Hatch, living a few miles distant, to·
stay with his family until his return.   During his ab-
sence in Orange county, and on the 12th day of De-
cember, 1891, the dead bodies of Miss Bruce, the little·
boy, Mrs. Hatch and her little son, who had accompa-
nied her to the Packwood place, were found in the·
house, under circumstances about which there is no·
dispute, indicating that they had been brutally mur-
dered.   The plaintiffs in error were convicted of mur-
der in the first degree—one of them (Marion Clinton)·
being recommended to the mercy of the court—under·
an indictment found at the fall term, A. D. 1893, of
the Volusia Circuit Court, charging them with the·
murder of Adelaide Bruce.

The indictment contains six counts; the first one·
alleging that Irving Jenkins effected the death of Ade-
laide Bruce by means of a leaden bullet discharged by
him from a certain pistol, and that the other defend-

ants were present, aiding and abetting the commission or the murder. The second count alleges that William A. McRae effected the death of Adelaide Bruce by means of a leaden bullet discharged by him from a certain pistol, and that the other two were present aiding and abetting the commission of the murder. The third count alleges that Marion Clinton effected the death of the person named by means of a leaden bullet discharged by him from a certain pistol, and that Jenkins and McRae were present aiding and abetting the murder; and the fourth count charges that Irving Jenkins effected the death of Adelaide Bruce by striking and beating her with a certain double-barrel gun, and that McRae and Clinton were present aiding and abetting the commission of the murder. The other counts charge the commission of the offense the same way, except in the one McRae, and Clinton in the other, are charged as committing the offense, and that the others were present aiding and abetting the commission thereof.

On application made, by the accused, the case was transferred to Lake county, and upon a trial in that county the accused were convicted upon the fourth count in the indictment. Motions in arrest of judgment and for new trial were made and overruled, and the accused sentenced—Jenkins and McRae to be hung, and Clinton to confinement in the penitentiary for life.

An assault was made on the indictment by plea in abatement on the ground that it was found by a grand jury not drawn according to law, in that said jurors were not drawn from any box as required by Chapter 4122, laws of 1893, nor were thirty persons summoned as jurors for said term from whom eighteen were se-

lected to serve as grand jurors by the court as required by section five of said act, but the same were summoned by the sheriff of Volusia county from the body of the county at large. A demurrer was sustained to this plea and defendants excepted, and the ruling is assigned as error here. Great strictness is required in pleas in abatement setting up simply irregularities in the selection of jurors. We said in Reeves vs. State, 29 Fla. 527, 10 South. Rep. 901, that in framing such pleas, the authorities held that no uncertainty or ambiguity should exist, and in fact the greatest accuracy and precision are required and they must be certain to every intent. Woodward vs. State, 33 Fla. 508, 15 South. Rep. 252. The act of 1893, Chapter 4122, repealed the act of 1891, Chapter 4015, appendix to the Revised Statutes, and was a substitute therefor. The plea before us alleges that the indictment was found by a grand jury not drawn according to the act of 1893, but was summoned from the body of the county at large. If for any sufficient cause a grand jury can be legally drawn from the body of the county at large, it is evident that the plea is defective, because it does not allege that such cause did not exist. Section 1157 Rev. Stats., which is a revision of the law of 1875, provides that "whenever, for any cause, no petit jurors or less than the whole number have been drawn or summoned in the manner provided by law for any regular or special term of the circuit or county courts of this State, it shall be lawful for said courts to issue a special venire for a sufficient of such jurors for said term, to be directed to the sheriff cammanding him to draw from the box provided for in section 3, Chapter 4015, laws of Florida of 1891, or to summon from bystanders, or the body of the county at large, the number of qualified jurors so ordered." The same rule

applies to the selection of grand jurors—sec. 2803 Rev. Stats. The act of 1893, Chapter 4122, has repealed and taken the place of the act of 1891, Chapter 4015, but the former act has not repealed section 1157 of the Revised Statutes. The repealing clause of the act of 1893 is confined to the statute of 1891, and there is no conflict between the former and section 1157 of the Revised Statutes. In fact there would be a deficiency in the statutory regulation of selecting jurors if the court did not have the power to provide a jury in case there was a failure for good cause to draw one under the act of 1893. In our judgment the plea was defective, and the court did not err in sustaining a demurrer to it.

The objections urged in the trial court, and the assignments of error made here, based upon the alleged disqualification of certain petit jurors, are not argued, and we will devote no space to them.

Counsel representing the State announced during the taking of testimony that it had become of importance to the State that what the accused testified in the grand jury room should be placed before the jury, and it was explained that the State attorney himself took down the testimony of the witnesses before the grand jury. The State attorney being sworn, was asked to look at a paper and state in whose hand writing it was, and said in reply that the portions to the ninth line on the third page, and beginning from the bottom of the sixth page on, was in his hand writing, and that it purported to be the testimony of W. A. McRae before the grand jury at the Spring term, 1893. He further testified that he was present, examined McRae and took down the testimony mentioned as being in his hand writing, and that a member of the grand jury took down a portion of it, but the witness' recollection was that he con-

tinued the examination, and superintended the taking of it down, and looked over the shoulders of the juror while it was being taken down.    He also stated that it was barely possible that he may have gone from the room a few moments, but did not remember leaving the room.    The State attorney was not present when the grand jury elected a clerk, but he stated that the grand jury had a clerk.    At the time McRae was ex-- amined before the grand jury, he was under subpœna as a witness to attend that body, and at that time he was not charged with the commission of the offense in reference to which he was examined, and for which he was subsequently indicted, nor was he at that time in custody of any officer.    The State attorney notified him when he appeared in the grand jury room that he was under suspicion, "that he need not testify unless he saw fit, that he need not testify to anything that would criminate himself; that he could not be compelled to do so; that he was at liberty to testify or not." After this he was willing to testify as to anything he knew about the case, and did testify.    Before the introduction of the paper in evidence the State attorney was asked, on cross-examination, if he took down McRae's testimony in writing, and stated the writing was what he took down, and that he had designated the part he did not take down.    He had already stated that he superintended the taking of the part taken down by the grand jury, and looked over his shoulders when it was done.    The State attorney further testified that he did not remember that the testimony referred to was read over to McRae after it was taken down— thought that it was not; portions of it may have been read to him as it was taken down.    The testimony was not signed by McRae or any one else.    Counsel for the State asked the court to authorize the removal of

secrecy from the testimony of William A. McRae before the grand jury, preliminary to the introduction before the trial jury of his testimony before the grand jury at the Spring term, 1893, of the Circuit Court for Volusia county. Objection was made on the part of the accused on the following grounds, viz: that defendant McRae had not testified in the case, nor was there any complaint against him for perjury; the law requires that the grand jury shall have a clerk who shall preserve the minutes of the proceedings before it, which minutes shall be delivered to the State attorney when it shall direct, and there was no evidence before the court that the grand jury directed the minutes to be given to the State attorney; that the evidence showed that the proposed testimony was not taken by the clerk of the grand jury. The objections were overruled and defendants excepted.

The State attorney further testifying, was asked if that (referring to the paper) was the testimony of McRae at the Spring term, 1893, of the Circuit Court of Volusia county, and stated that it was. He also stated "this is substantially the testimony as taken down by me and that clerk; it is the testimony which is substantially as given by Mr. McRae taken down by me at the time, and the clerk; it is not *verbatim*." The paper was admitted in evidence, and the witness read it to the jury as the statement of McRae before the grand jury at the Spring term, 1893, of the Volusia Circuit Court, and the defendants excepted.

A statement of the testimony of Marion Clinton before the grand jury at the same term was also admitted in evidence under similar circumstances, over the objections of the defendants. Clinton was not at the time charged with the offense, or under arrest, and was cautioned by the State attorney before testifying, as

was McRae.    In Clinton's case the State attorney alone
took down the testimony.    Referring to the paper,
the State attorney testified that it was the testimony of
Marion  Clinton given before the grand jury at the
Spring term, 1893; it was the substance of his testi-
mony, and was correct.    On cross-examination he was
asked if it was what may be termed his notes of the
testimony of Clinton, and replied it ''might be termed
that, and a little more than the notes of the testimony;
I took it down as near as I could, abbreviating a little
in the matter.''    The paper was introduced in evidence,
and  was read to the jury  by the witness  as the testi-
mony of Marion Clinton before the grand jury, and
defendants excepted.    It appears that there were vari-
ous abbreviations. by letters and figures in the state-
ment, and as it was read to the jury the State attorney
stated what they stood for.    These statements, admitted
as evidence, do not contain any confessions on the part
of the accused, but they purport to contain their state-
ments before the grand jury in reference to their con-
nection with the case, and in respect to which they
were contradicted by testimony introduced for the
State.

It is insisted here on behalf of the accused that the
court erred in permitting the written statements to be
introduced as evidence against the defendants, and the
grounds of this insistance may be arranged under
three heads:    First,  the introduction of the written
statements in evidence was an invasion of the secrecy
of the grand jury not authorized by law; second, the
statements made by the accused before the grand jury
were not voluntary, and should have been excluded on
this account; and, third, the statements themselves
were not admissible as evidence, and at most could
only be used for the purpose of refreshing the memory

of the witness in case it became necessary and proper to do so in giving his oral testimony of what was said by the accused before the grand jury. It is provided by statute in this State that "no grand juror or officer of court, unless the court shall so order, shall disclose the fact that any indictment for a felony has been found against any person not in custody or under recognizance, otherwise than by issuing or executing process on such indictment, until such person has been arrested." "That no grand juror shall be allowed to state or testify in any court in what manner he or any other member of the jury voted on any question before them, or what opinion was expressed by any juror in relation to such question." "Members of the grand jury may be required by any court to testify whether the testimony of a witness examined before such jury is consistent with or different from the evidence given by such witness before such court; and they may also be required to disclose the testimony given before them by any person, upon a complaint against such person for perjury, or upon his trial for such offense." Secs. 2812, 2813, 2814 Rev. Stats.

It is contended under the first objection that the only cases in which a grand juror can be required, or should be permitted, by the court to disclose the testimony of witnesses before that body are those mentioned in section 2814 (the one last mentioned), and that as the accused never testified before the court, and there was no complainst against them for perjury, the statements should not have been admitted. The cases of Tindle vs. Nichols, 20 Mo. 326; Beam vs. Link, 27 Mo. 261; and Commonwealth vs. Green, 126 Penn. St. 531, 17 Atl. Rep. 878, 12 Am. St. Rep. 894, are cited in support of this contention. The fifteenth section of a Missouri statute was the same as section 2814

of our revision, but in a subsequent section of the Missouri statute it was provided that "no grand juror shall disclose any evidence given before the grand jury, nor the name of any witness who appeared before them, except when lawfully required to testify as a witness in relation thereto." In the case of Tindle vs. Nichols, *supra*, the court say: "In what cases can a grand juror be lawfully required to testify as a witness in relation thereto? Such as are embraced in the fifteenth section, and such only." The cases mentioned in the fifteenth section were the only ones, as held by the court, in which a grand juror could lawfully be required to testify in relation thereto. This ruling was affirmed in the case of Beam vs. Link, *supra*. We have no such provision in our statute as that contained in the fifteenth section of the Missouri statute. The Pennsylvania case referred to holds that on a motion to quash an indictment upon the ground that the presentment was not made upon the knowledge and observation of the grand jury as required by their practice, but upon the testimony of witnesses taken before them on another complaint, a member of the grand jury was a competent witness to testify that that body, in making the presentment, acted upon such testimony, and not upon their own knowledge and observation. It is stated generally in the books, referring to the subject, that at common law members of the grand jury should not disclose what transpired before that body in the course of their investigations, but the reasons for excluding such disclosures rest upon grounds of public policy. In Commonwealth vs. Hill, 11 Cush. 137, it is said: "The extent of the limitation upon the testimony of grand jurors is best defined by the terms of their oaths of office, by which the commonwealth's counsel, their fellows, and their own, they are to keep

secret.  They can not, therefore, be permitted to state
how any member of the jury voted, or the opinion ex-
pressed by their fellows or themselves, upon any ques-
tion before them, nor to disclose the fact that an indict-
ment for a felony has been found against any person
not in custody or under recognizance, nor to state in
detail the evidence on which the indictment is founded.
1 Greenleaf on Evidence, sec. 252; Freeman vs. Arkell,
1 Car. & P. 135, 137; Huidekoper vs. Cotton, 3 Watts
56.  To this extent the free, impartial, unbiased ad-
ministration of justice requires that the proceedings
before grand juries be kept secret.  By no other means
can perfect freedom of deliberation and opinion among
jurors be effectually secured, and the ends of an ener-
getic administration of criminal justice surely attained.
But we are not aware that the sanction of secrecy has
ever been extended beyond this; we know of no author-
ity which carries the rule of exclusion further, and
we can see no ground of policy or sound reason for
its extension.  This rule has been substantially recog-
nized by the Revised Statutes of this commonwealth,
c. 136, secs. 12, 13, which would seem to be a signifi
cant indication of the extent to which public policy,
upon which the rule mainly rests, requires it to be
carried.  It seems to us, therefore, that a member of
a grand jury may testify to any fact, otherwise com-
petent, which does not violate the restrictions above
stated." The sections of the statute referred to in this
decision are substantially the same as sections 2812
and 2813 of our Revised Statutes.  To the same effect
was the decision in the case of Commonwealth vs.
Mead, 12 Gray 167.  The grounds of public policy for
excluding the testimony of grand jurors are said in
this case to be three-fold: "One is, that the utmost
freedom of disclosure of alleged crimes and offenses

by prosecutors may be secured. A second is, that perjury and subornation of perjury may be prevented by withholding the knowledge of facts testified to before the grand jury, which, if known, it would be for the interest of the accused or their confederates to attempt to disprove by procuring false testimony. The third is, to conceal the fact that an indictment is found against a party, in order to avoid the danger that he may escape and elude arrest upon it, before the presentment is made." It is further said in this case: "But when those purposes are accomplished, the necessity and expediency of retaining the seal of secrecy are at an end. *Cessunte ratione, cessat regula.*" A different rule might have the effect to exclude from the investigation of a case essential and important evidence by adhering to a principle of exclusion based upon public policy, after the reasons on which the rule is based have ceased to exist. How a grand juror or any member of the jury voted on any question before them, or what opinion was expressed by any juror in relation to such question is forever sealed, not only on grounds of public policy, but by positive statute (section 2813). The courts have no discretion to go into such matters. But independent of statutory regulation, it has long been established that it is discretionary with the trial court to permit a grand juror to be examined as to what a witness testified to before the grand jury, when competent and the ends of justice require it, and we do not see that our statutes have changed this rule. Authorities cited *supra;* State vs. Broughton, 7 Ired. 96, S. C. 45 Am. Dec. 507; State vs. Horad, 15 Oregon 262; United States vs. Kirkwood, 5 Utah 123; Notes to Commonwealth vs. Green, 12 Am. St. Rep. 894. The provisions of section 2814 as to the special cases mentioned do not, in our jud-

ment, exclude an enquiry in other cases sanctioned by law when, in the discretion of the court, it becomes proper to open up such enquiry.

Section 2807 provides that the State attorney shall, when required by the grand jury, attend that body for the purpose of examining witnesses in its presence and to give it advice upon legal matters, and whenever it would be proper for a grand juror to testify as to the statements of witnesses before the grand jury the State attorney can likewise testify as to such matters. There is no difference in principle between the two in such matters. State v. Van Buskirk, 59 Ind. 384; Knott v. Sargent, 125 Mass. 95.

The second objection is, that the testimony of the accused before the grand jury was not voluntary. In Newton vs. State, 21 Fla. 53, it was said that "the general rule is, that what a party says in relation to the offense is admissible in evidence against him, whether on oath or not; provided, always, he is not at such time charged with the commission of the crime, and such statement is voluntary." The view expressed in Hendrickson vs. People, 10 N. Y. 13, was also quoted to the effect that "in all cases, as well before coroners' inquests as on the trial of issues in court, when the witness is not under arrest, or is not before the officer on a charge of crime, he stands on the same footing as other witnesses. He may refuse to answer, and his answers are to be deemed voluntary, unless he is compelled to answer after having declined to do so. In the latter case only will they be deemed compulsory and excluded." The question in the Newton case arose on the admission of an affidavit made by the accused before a coroner. According to ancient *nisi prius* decisions in England it seems to have been held that testimony given under oath in any judicial inves-

tigation could not be voluntarily given, but this view was overthrown by the case of Regina vs. Wheater, 2 Moody's Crown Cases 45, in which all the judges participated. In some of the cases it is stated that the testimony given in a judicial investigation, although under oath, may be omitted if, at the time it was given, the prisoner was not resting under any charge or suspicion of having committed the crime. Where an accused has been charged in a judicial way, or taken into custody on an accusation of crime, his examination on oath is viewed in a different light than when he is examined before arrest or charged with the offense. The accused were not at the time of testifying before the grand jury charged with the offense, or in custody, and we need not here say what would be our ruling if such had been the case. The rule stated in the Newton case, in reference to an examination before a coroner, that where a witness is not under arrest, or charged with the crime, and is instructed by the official conducting the examination that he need not answer any question that would criminate him, his testimony may be given in evidence, in a proper case, on a subsequent indictment for the offense, applies to all judicial investigations. The right to protect himself by refusing to answer questions tending to criminate himself, and which he can do under all circumstances, is deemed a sufficient shield against injury or harm under such circumstances. State vs. Vaigneur, 5 Rich. 391; Teachout vs. People, 41 N. Y. 7; Hendrickson vs. People, 10 N. Y. 13, S. C. 61 Am. Dec. 721; People vs. McMahon, 15 N. Y. 384; Farkas vs. State, 60 Miss. 847. State vs. Clifford, 86 Iowa 550, 53 N. W. Rep. 299. In the present case, as stated, the accused were not in custody, nor were they at the time resting under any charge of the crime for which they were subse-

quently indicted, and it is made to appear that the State attorney cautioned them before being examined, that they need not testify unless they were willing to do so, and that they could not be compelled to criminate themselves. The fact that they were told at the time that they were under supicion does not have the effect to exclude their testimony before the grand jury.

The next objection is, that the statements reduced to writing in the manner shown were not competent or proper evidence against the accused, and at most could only be used as memoranda for refreshing the memory of the witness in case it became necessary for that purpose. The bill of exceptions shows that the written statements of evidence of the accused before the grand jury as made by the State attorney were themselves admitted as evidence, and the original papers sent up for inspection, under the order of the circuit judge, show by endorsements that the veil of secrecy was removed and the papers themselves offered in evidence on the examination of the State attorney. From what has been said it follows that it was competent for the State to prove on the trial what the accused testified to before the grand jury, and that a member of that body, or the State attorney, could testify as to such matters within their knowledge. We can see no objection to the State attorney or a member of the grand jury testifying from recollection as any other witness as to what the accused said before the grand jury, but we have been unable to find any authority to sanction the view that the written statements of evidence made by the State attorney in the *ex parte* examination of witnesses by him, before the grand jury, are evidence of themselves of what the witnesses there testified. We presume that the written statements of evidence were admitted in this case on the ground

:that they were made by an officer of the law in the performance of an official duty, and that as such they were entitled to consideration as evidence of what they contained. It is true that in investigations before examining courts, such as committing magistrates and coroners' inquests, where the testimony of witnesses has been reduced to writing, as provided by statute, it may be introduced as evidence of what the witnesses there swore. In Jackson vs. State, 81 Wis. 127, 51 N. W. Rep. 89, it was held that on the second trial of a criminal case the testimony of a deceased witness, as taken down by the official stenographer at the former trial, may be received in evidence on behalf of the prosecution. And in California it seems the notes of the official reporters can be used as evidence of what witnesses testify to. The case of People vs. Morine, 61 Cal. 367. The case of State vs. Friedrich, 4 Wash. 204, 29 Pac. Rep. 1055, 30 Pac. Rep. 328, 31 Pac. Rep. 332, holds that a stenographer's notes of evidence taken at a former trial can not be introduced to impeach the testimony of a witness on the second trial regarding matters alleged to have been testified to by him at such former trial. In this case it is said: "Bowman (the stenographer) was present and competent to testify. He could have been asked whether Longstaff had testified as he claimed; and if unable to answer without his notes he could have been permitted to refer to them to refresh his recollection. But independent of him his notes had no standing in the court." The California case cited was referred to and it was observed that under the statute of that State the notes of reporters when written out and certified were made *prima facie* correct statements of testimony. *Vide* Rounds vs. State, 57 Wis. 45, 14 N. W. Rep. 865. Our statutes provided that the grand jury "may appoint one of its

number to be clerk to preserve minutes of the proceedings before it, which minutes shall be delivered to the State attorney when it shall direct." "Whenever required by the grand jury, it shall be the duty of the State attorney to attend it for the purpose of examining witnesses in its presence, or for giving it advice upon any legal matter, and to issue subpœnas and other process to secure witnesses." Secs. 2806, 2807 Rev. Stats. It is also provided in section 2809 that the foreman of the grand jury shall return to the court a list under his hand of all witnesses who shall have been sworn before the grand jury during the term, and the same shall be filed of record by the clerk. In the present case it is not shown that the written statements introduced in evidence were minutes of the proceedings kept by the clerk of the grand jury. The State attorney himself took down the evidence, except a small portion of the testimony of one of the accused, which was taken down by a member of the grand jury, but if it had all been taken down by the clerk of the grand jury we do not see that it would have made any difference. The accused did not sign the statements of evidence, and it does not appear that they approved them in any way, or that they were even read over to them after being reduced to writing. To authorize the introduction of such evidence against a party, some statutory warrants must be shown, and we fail to find any statute giving such statements the effect of evidence, or even making them matters of public record. The investigations before grand juries are *ex parte* and secret, and, aside from the presentments, the only portions of the proceedings before such bodies required to be filed or recorded are the lists of witnesses sworn before them. The rules of the common law, as shown by the cases we have already cited, forbid grand jurors

to disclose the testimony of witnesses before their body, the reasons for which are obvious, and unless required by some court, in the exercise of a discretion in the furtherance of justice, public policy required such matters to remain undisclosed.   Our statutes have indicated two cases in which public policy no longer requires, in the judgment of the Legislature, that the veil of secrecy should be so closely guarded, and, as we have held, the mention of these cases does not deprive the court of the right to enquire into such other matters before the grand jury as is sanctioned by the practive of the courts, and not in violation of express statutory provisions.   The authority to preserve minutes of proceedings before the grand jury, and for them to be delivered to the State attorney when it shall direct, and the duty devolving upon the State attorney to attend the grand jury, examine witnesses, and give advice, do not, in our judgment, contemplate that the grand jury shall make any official record of the testimony of witnesses examined before it.   The minutes of the proceedings kept by a grand jury are for its own use, and for the information and assistance of the prosecuting officer, but such *ex parte* proceedings have not been invested by statute with the force of a binding record against individuals who appear before that body as witnesses.   They may not know, or be able to know, what the State attorney or grand jury has reduced to writing, and there is no way open to them for an investigation as to what has been reduced to writing as their statements.   Upon no principle of law ought witnesses to be bound by such statements, and in our judgment the court was in error in permitting such statements to be introduced as evidence *per se* of what the accused stated before the grand jury.   The State attorney should have been examined as to his knowl-

edge of what the accused stated, and an opportunity afforded to investigate what was said independent of any written statements made at the time. Such statements could have been used, if necessary, for refreshing the recollection, but for no other purpose. The statements admitted as evidence do not, as already stated, contain confessions of guilt, but they purport to contain statements of the accused in reference to matters connected with the murder of Adelaide Bruce that were contradicted by other evidence of the State, and we can not say what harm was done by the use of the statements as evidence. In cases involving such consequences the court can not say that improper testimony was harmless unless it affirmatively appear that no injury was done.

Mrs. Hatch was one of the four persons found dead in the Packwood house, in a room adjoining the one in which the dead body of Miss Bruce was found. The husband of Mrs. Hatch was asked, on examination as a witness for the State, whether or not his wife possessed a red flannel underskirt, and stated that she did. Being further asked if it was like the one exhibited to him, replied that he could not state; that he did not know that he ever saw the skirt, his wife said that she was making one a few days before she went away, and that he could not identify the skirt; that he could not recall ever having seen it—may have done so, but could not recollect of doing so. He further stated that a Mrs. Berry left a piece of red flannel at his house as a present while they were away, and that he told his wife to make it up for herself; that his wife made it into skirts for herself; she told him that she had, or rather for herself and sister; one she sent to her sister, and the other she said she was going to keep. He also stated

52

that no red flannel skirt was found among his wife's clothing at home after the murder. The testimony of the witness as to what his wife said to him about the flannel skirt was objected to as being hearsay evidence, and the court overruled the objection. While the witness stated positively that his wife possessed a red flannel skirt, it is evident from all that he said that he had not seen the skirt, and what he knew about its being made was derived from what his wife told him. It is proper to state in this connection that there was testimony tending to show that a red underskirt was discovered on the dead body of Mrs. Hatch at the time of the inquest held over the dead bodies. Some of the persons who assisted in dressing the bodies for burial were asked about the red skirt, but could not recollect of seeing one. There was testimony, however, as stated, tending to show that Mrs. Hatch had on a red skirt. There was no question about the identity of Mrs. Hatch, as she was well known to many of the witnesses who saw the dead bodies, and clearly recognized by them. The State introduced in evidence a statement made by the defendant McRae a short time after the murder was discovered, in speaking about seeing Mrs. Hatch on the Packwood place the day before the dead bodies were discovered, to the effect that he would never forget, or could never forget, the red skirt and white waist of Mrs. Hatch. In connection with this statement it is apparent without further recital that the importance of showing that Mrs. Hatch was wearing a red skirt at the time she was killed extends beyond the mere proof of the *corpus delicti*. That the testimony as to what Mrs. Hatch said to her husband about making the flannel into skirts is hearsay, is entirely clear, and the court should have excluded it on the objection made. We do not decide

that the ruling on this exception, if it stood alone, would result in a reversal of the judgment. In so far as the testimony objected to bore on the question of the *corpus delicti*, it was wholly immaterial in this case, but in so far as it added weight to the testimony that Mrs. Hatch had on a red skirt, in view of the statement of McRae, above referred to, a different estimate should be placed upon it. The fact that Mrs. Berry left red flannel at the house of Mr. Hatch can be shown in connection with the other facts, but the statements of the wife as to making the flannel into skirts, was hearsay, and the only proper way for the court to deal with such evidence when offered is to exclude it from the case.

William Baxter testified for the State that he had conversations with defendant Clinton regarding the Packwood murder, after the murder was discovered. Witness did not remember dates of the conversations, but they were had at various places. Witness referred to a conversation at Olsen's and at the house of witness. The last conversation witness remembered was on the 12th day of February, 1893, something over one year after the discovery of the dead bodies at the Packwood place. Witness was asked if Clinton said anything with regard to McRae in the conversation, and answered that he did not at that conversation, referring, as shown by the connection, to the last conversation mentioned. Witness stated that Clinton referred to McRae in one of the conversations when he, McRae, was not present. Objection was made to what Clinton stated McRae said in the latter's absence, and the court overruled the objection and permitted the witness to detail such statement. Witness testified that he and Clinton were talking in regard to the murder, and Clinton said McRae told him (witness) that he (McRae)

saw Miss Bruce blow the light out on the night that they were murdered. Question: What else? Answer: "Well, that is all, with the exception that he told me and showed me in the position she stood to blow the light out." Question, "Clinton did?" Answer: "Yes, sir; that McRae told him." Question: "Clinton showed you the position?" Answer: "Yes, sir; that she stood in when she blew the light out." Question: "Clinton showed you the position that McRae stood?" Answer: "Yes, sir." Witness stated on cross-examination that he could not remember the date when the conversation in reference to blowing out the light occurred. He could remember that it was on the road between his place and Smyrna, as they were walking there, and thought it was in the evening, but could not remember the day, the week or the month. All the conversations the witness had with Clinton were subsequent to the discovery of the dead bodies at the Packwood place.

The rule as to the admission in evidence of the acts and declarations of a co-conspirator in reference to the common design affecting his associates is thus stated by Mr. Greenleaf, *viz:* "A foundation must first be laid by proof sufficient in the opinion of the judge to establish *prima facie* the fact of conspiracy between the parties, or proper to be laid before the jury as tending to establish such fact. The connection of the individuals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is, therefore, original evidence against each of them. It makes no difference at what time any one entered into the conspiracy. Every one who does enter into a common purpose or design is generally deemed,.

in law, a party to every act which had before been done
by the others and a party to every act which may af-
terwards be done by any of the others in furtherance
of such common design.   *   *   *   If they took place
at a subsequent period, and are, therefore, merely nar-
rative of past occurrences, they are, as we have seen,
to be rejected." 1 Greenleaf on Evidence (15th ed.),
sec. 111; Williams vs. Dickenson, 28 Fla. 90, 9 South.
Rep. 847; Hall vs. State, 31 Fla. 176, 12 South. Rep.
449.  The rule is, that while proof of an overt act or
declarations by one in pursuance of a common purpose
or design to commit a crime may be given in evidence
against all of the conspirators, the acts and declara-
tions to be admitted must be such only as were done
and uttered during the pendency of the criminal en-
terprise and in furtherance of its objects.  If they
occur at a subsequent period and are merely narrative
of past occurrences, they are not admissible against
any but the party making or uttering them.  The
principle upon which said evidence is admitted is that
it must show the acts or declarations to be a part of the
*res gestœ*, and when the criminal enterprise is at an
end, whether by accomplishment or abandonment, no
one of the confederates can be permitted by any sub-
sequent act or declaration of his to affect the others.
State vs. Larkin, 49 N. H. 36, S. C. 6 Am. Rep. 456;
State vs. Duncan, 64 Mo. 262; People vs. McQuade,
110 N. Y. 284, 18 N. E. Rep. 156, 1 L. R. A. 273; Phil-
lips vs. State, 6 Texas App. 364; Card vs. State, 109
Ind. 415, 9 N. E. Rep. 591.

In our judgment the court erred in permitting the
witness Baxter to testify as to what Clinton said
McRae told him in reference to seeing Miss Bruce blow
out the light.  McRae was not present, and, as it ap-
pears from the record, the statement was made after

the murder at the Packwood place occurred. The con-
versation with McRae, as given by the witness, was a
mere narrative of a past transaction, and shown to be
subsequent to the commission of the crime.

There is another exception to the admission of evi-
dence which, in our judgment, should have been sus-
tained by the court.    It appears that for two or three
months in 1892 the defendant Jenkins was confined in
the jail of Duval county, in the custody of the sheriff
of that county, on a charge of selling liquors in viola-
tion of the United States statutes.    Prior to that time
Jenkins had been arrested under a charge for the mur-
der of which he now stands convicted, but had been
discharged, before his incarceration in the Duval
county jail on the complaint of violating the laws of
the United States.    The sheriff of Duval county had
received information that Jenkins probably knew ma-
terial facts in reference to the Packwood tragedy, and
had conversed with him in jail several times on that
subject.    The State put in evidence the statements of
Jenkins to the sheriff of Duval county in reference to
the murders at the Packwood place, and in connection
with the evidence of such statements the sheriff was
asked if he knew of Jenkins paying any money, or
giving an order for any money, to any lawyer or per-
son while he was confined in jail.    He stated that an
attorney, giving name, went to the jail while witness
was there and told him he would like to have him wit-
ness an order, and to get him a pen and ink; that the
attorney wrote the order on a piece of paper, and said
to witness he would like him to witness the order Jen-
kins was to sign on Dr. McRae for fifty dollars.    The
order was written in the jail, signed by Jenkins in
presence of witness and witnessed by him.    The wit-
ness further stated that he did not recollect whether

he noticed on the paper itself to whom it was addressed, but it was an order on somebody for money. Being asked if he could recall the order, said that when he signed it—his recollection was—that he was signing an order on Dr. McRae. He was further asked if he could recall what Dr. McRae the order referred to, and said: "Only this way, that the only Dr. McRae that we had talked about was Dr. McRae at Sanford; I supposed he lived there, somewhere in Orange county." The witness did not know Dr. McRae. It appears from other evidence that Dr. McRae of Sanford was the father of William A. McRae, one of the codefendants of Jenkins, and also that Jenkins had been working for and staying with the son on the McRae place, near the Packwood place, for some time before the murder.

It appears further from the evidence that one Isaiah Adams, who was confined in the Duval county jail with Jenkins, was examined by the State in reference to statements made by Jenkins in jail touching the murders at the Packwood place, and, in that connection, stated that he, witness, wrote a letter for Jenkins to Dr. McRae for money. He further stated that Jenkins told him "to say in the letter that they wanted him to swear that Mr. McRae and Clinton were connected with that murder, and he would not do anything of the kind." The letter after being sealed and delivered to Jenkins was passed out to a trusty girl, also an inmate of the jail, and witness never saw it after it was handed to the girl. Witness knew Dr. McRae personally, and the letter was directed to Sanford.

The defendants objected to the testimony of the sheriff in reference to giving the order on Dr. McRae on the ground that it was irrelevant and immaterial evidence, and insisted that it had nothing to do with the case. The judge stated that it was difficult to tell,

where everything was circumstantial, what relevancy it may have; it didn't appear to him to be relevant then, because he did not know its object, and if it was not made relevant, defendants could move to strike it out. The objection made was overruled, and defendants excepted. Further objection was made by defendant Jenkins to the testimony of the sheriff by moving to strike it out, and this motion was denied. The testimony, other than that in reference to the order for the money, need not be stated. After the motion on behalf of the defendant Jenkins to strike out the testimony of the sheriff had been overruled, the defendants McRae and Clinton objected to the testimony bearing upon the case against them, on the ground that they were not present, and the court stated that the testimony could not be used against them if not present. Counsel for the State also stated that the testimony would not be used against them.

It is competent to introduce any and all evidence that is material and relevant, and that tends to prove the guilt or innocence of the accused. In cases of circumstantial evidence, every fact from which the jury may legitimately deduce guilt or innocence is proper to be submitted to them, and although the relevancy of any fact, when standing alone, may not be apparent, yet, when taken in connection with any other fact, or all the other facts, properly admitted, its relevancy is made to appear, it should go to the jury for their consideration. This rule thus broadly stated should not, however, in cases of purely circumstantial evidence, any more than in others, be carried to the extent of infringing upon another rule, that all evidence should be confined to the question in issue, and tend to prove some essential fact involved in the issue in the case. The view expressed in State vs. Meader, 54 Vt. 126,

was approvingly quoted by this court in the Newton case, to the effect that the admission of illegal evidence, if objected to, though under an offer of connecting it with other proof that would render it competent, and though charged out of the case by the court, is a cause for setting aside a verdict, unless the court is able to say affirmatively that it worked no injury to the adverse party.  It was also said that "it is a well-settled rule of law that when the error is in the admission of illegal evidence which bears in the least degree on the question in issue, it can not be disregarded."  In cases depending solely upon circumstantial evidence the court should permit nothing that bears upon the case in the least to go to the jury, unless warranted by law or the rules of evidence.  Testimony that does not tend to prove motive, or establish some other material fact essential to the crime charged, should not be admitted, and especially when it may tend to produce an erroneous impression on the minds of the jurors to the prejudice of the accused.  These elementary principles in the introduction of evidence are well established.  We do not see that any legitimate inference that Jenkins was connected with the murder at the Packwood place can be drawn from giving the order in question.  He was not at that time under arrest for, or charged with, the murder, but was in custody for another and different offense.  The record does not affirmatively show that Dr. McRae owed Jenkins any money, and if any unfavorable inference is to be drawn from drawing the order, taken in connection with the letter written, the reasonable one is, that he was seeking to obtain money for the purpose of extricating himself from the charge under which he was then in custody.  The need of Jenkins for money on the order given was while he was in jail on a charge

for violating the statutes of the United States, and the order was in favor of an attorney who appeared in the jail, and it is not shown to have any connection with the charge of murder against Jenkins. The fact that he had worked with the son on the McRae place may account for the order on Dr. McRae, but if it be legitimate to infer from it, taken in connection with the statement in the letter to the effect that they were trying to get him to swear that Mr. McRae and Clinton were connected with that murder, and he would not do anything of the kind, that he was using improper means to extort money, still the legitimate inference, it seems to us, is that he was trying to get out of custody under a different charge than the one for which he and his codefendants were subsequently indicted. At the time the order was given none of the defendants are shown to have been under indictment for the murders at the Packwood place, and to permit the order, given under the circumstances mentioned on the father of W. A. McRae, subsequently indicted with Jenkins, to be considered as evidence on the trial for said murder, would be extending the proof of facts, from which a legitimate inference of guilt could be drawn, too far. The record does not show anything material in reference to the order or letter further than as above stated. We do not know that Dr. McRae ever received any letter or order from Jenkins, nor is there any showing that the defendant W. A. McRae was ever connected with the order or letter, or ever knew anything about them. This testimony, while not affording any legitimate inference that the defendants were connected with the murder for which they were tried, is calculated, it seems to us, to produce an erroneous impression on the minds of the jury. The circuit judge stated at the time the testimony was admit-

ted that he did not then see its relevancy, and we agree with him in this, and discover nothing further in the evidence to make it relevant. It is true that the court stated that if the testimony was not made relevant, defendants could move to strike it out, but we do not see that they are precluded from insisting on the objection made to the introduction of the evidence by not, at a subsequent stage of the case, moving to strike it out. The court can regulate the order of the introduction of evidence, but when irrelevant testimony is offered and objected to, and it is admitted on the theory that its relevancy may be shown by subsequent evidence, if such evidence is not introduced the irrelevant part should be excluded by the court. We do not overlook the fact that the court stated that the evidence in reference to the order could not be used against McRae and Clinton, but we deem the evidence improper as against Jenkins, and its prejudicial character is that the jury may have been somewhat influenced by it to believe that the defendants were connected with the murder. How it could have any legitimate effect to establish guilt against Jenkins, without operating to the prejudice of the other defendants, is difficult to see.

It is further insisted that all the testimony of Broward as to the statements of Jenkins should have been excluded from the consideration of the jury. Had proper exceptions been taken to this testimony, on the ground that such statements were not shown to have been voluntarily made to the witness, a majority of the court are inclined to the view that the testimony should have been excluded, but as exceptions, on the ground stated, were not properly made of record, further discussion of this objection will not be indulged in here.

What was said in reference to the admissibility of the testimony of the accused before the grand jury disposes of the objections made as to their testimony before the coroner's jury. Such testimony voluntarily given before the coroner when they were not under arrest is competent, and when reduced to writing and signed by them, the writing itself is the proper evidence. This testimony when not reduced to writing and signed by them may be shown by witnesses who can testify of their recollection what it was.

Other objections to the admissibility of evidence insisted on here need not be considered. To the extent permitted by the court, we find nothing objected to by the accused and insisted on here to which they can justly complain.

The court charged the jury at the instance of the State as follows, *viz:* "That in cases of circumstantial evidence it is not necessary that the proof shall be conclusive; that it is sufficient if the jury believe from all the facts and circumstances of the case that the accused are guilty, and that they have no reasonable doubt in their minds of this fact. If the jury think that the facts in this case are all consistent with the supposition that the prisoners are guilty, and can not reconcile the circumstances produced in evidence with any other supposition than that of their guilt, it is their duty to find them guilty. All that can be required is not absolute and positive proof, but such proof as convinces them that the crime has been made out against the accused." Objections are made to portions of this charge. The first one is to the following portion: "If the jury think that the facts in this case are all consistent with the supposition that the prisoners are guilty, and can not reconcile the circumstances produced in evidence with any other supposition than that of their guilt, it

is their duty to find them guilty;" and the second ob-
jection is to the last sentence of the charge. It is
claimed that instead of telling the jury that if they
think that the facts in the case are all consistent with
the supposition of guilt, the court should have said,
if the jury believe from the evidence beyond a reason-
able doubt, etc. It is claimed further that the words
"beyond a reasonable doubt" should have been added
to the last sentence of the charge. The entire charge
must be looked to in considering the objections made.
Smith vs. Bagwell, 19 Fla. 117, S. C. 45 Am. Rep. 12;
Andrews vs. State, 21 Fla. 598; Pinson vs. State, 28
Fla. 735, 9 South. Rep. 706. The last clause of the
charge standing alone would be amenable to the objec-
tion made, but we find in the first clause of direction
that the jury must have no reasonable doubt of the
sufficiency of the facts and circumstances of the case
to establish guilt, and in the clause objected to the
jury were told, in effect, that the facts of the case must
all be consistent with the supposition that the prisoners
were guilty, and irreconcilable with any other suppo-
sition than that of their guilt. Considering the entire
charge, we do not see that the court excluded from the
jury the requirement that they must believe from the
evidence beyond a reasonable doubt that the defend-
ants were guilty. The charge as an entirety enforces
this requirement upon the jury. The objections urged
against the charge are not good. The charge asserts
that in cases of circumstantial evidence it is not neces-
sary that the proof should be conclusive. As to the
conclusiveness of evidence Mr. Starkie says: "What
circumstances will amount to proof will never be mat-
ter of general definition; the legal test is the sufficiency
of the evidence to satisfy the understanding and con-
science of the jury. On the one hand absolute, meta-

physical and demonstrative certainty is not essential to proof by circumstances. It is sufficient if they produce moral certainty to the exclusion of every reasonable doubt." This author also says that the circumstances should be of a conclusive nature and tendency. Such views have been approved by this court. Whetston vs. State, 31 Fla. 240, 12 South. Rep. 661; Kennedy vs. State, 31 Fla. 428, 12 South. Rep. 858.

At the request of the State the court further charged the jury that "in cases of this kind the conclusion to which the jury are conducted is that degree of certainty that they would come to in their own grave and important concerns, and that is the degree of certainty which the law requires, and which will justify them in returning a verdict of guilt from all the facts and circumstances laid before them. That the inculpatory facts must be incompatible with the innocence of the accused and incapable of explanation upon any other reasonable hypothesis than that of their guilt." This charge distinctly directs the jury that the degree of certainty which the law requires and which will justify them in finding a verdict of guilty on circumstantial evidence is that to which they would arrive in their own grave and important concerns. This charge is wrong, and lays down an improper standard for the guidance of juries in arriving at conclusions from the evidence in criminal cases. The subject-matter of this charge was thoroughly considered in the case of Lovett vs. State, 30 Fla. 142, 11 South. Rep. 550, and we do not deem it necessary here to go into any extended discussion of the cases bearing on the point. There are cases sustaining the view that the reasonable doubt which the jury must entertain in order to convict, means that their minds must be so thoroughly convinced that they would act upon the conviction as they

would in matters of the highest concern and impor-
tance to themselves. State vs. Nash, 7 Iowa, 347;
Polin vs. State, 14 Neb. 540. In the Lovett case this
court approved the views announced by the California
and Kentucky courts on the subject. The Kentucky
court in the case of Jane vs. Commonwealth, 2 Met.
(Ky.) 30, pronounced as improper and erroneous the
following instructions, viz: "That the jury should
weigh and consider all the facts and circumstances
proven to their satisfaction, in connection and combi-
nation, and should hold them and pass judgment on
them in that condition, and that if the conclusion from
the facts and circumstances so proven to their satisfac-
tion be that there is that *degree of certainty* in the case
that they would act on it in their own grave and im-
portant concerns, that that is the degree of certainty
which the law requires and which will justify and war-
rant them in returning a verdict of guilty." The court
said: "Men frequently act in their own grave and im-
portant concerns without a firm conviction that the
conclusion upon which they proceed to act is correct;
but having deliberately weighed all the facts and cir-
cumstances known to them, they form a conclusion
upon which they proceed to act, although they may
not be fully convinced of its correctness. But this
degree of certainty is wholly insufficient to authorize
a verdict of guilty in criminal cases. In such a case
the jury should be fully convinced of the correctness of
their conclusion that the prisoner was guilty, and that
conviction should be so clear and strong as to exclude
from their minds all reasonable doubt that their con-
clusion was correct." The California and other courts
endorse this view. People vs. Ah Sing, 51 Cal. 372;
People vs. Bemmerly, 87 Cal. 117. The degree of cer-
tainty required by the law, as asserted by the charge

before us, does not even demand that the jury should be so thoroughly convinced as that they would act upon the conviction as in matters of the *highest* concern and importance to themselves. It asserts that the degree of certainty is such as they would reach in their own grave and important concerns. A charge containing such language was declared erroneous in the Kentucky decision cited. It is true that all through the instructions given to the jury by the court it is stated that the evidence must convince them of the guilt of the accused beyond a reasonable doubt before they could convict, but the charge under consideration fixed a degree of certainty in weighing the evidence which was calculated to mislead the jury throughout the entire case, and we can not say that it did not do so.

We do not deem it necessary to refer to but one other charge excepted to and discussed by counsel for plaintiffs in error, and that is the third charge given at the instance of the State. It is not improper for the court, when deemed necessary to do so, to tell the jury that the fact that unfortunate cases have occurred where innocent persons have been convicted upon circumstantial evidence, should not enter into their consideration of the evidence before them. So far as what is here stated is embodied in the charge referred to it is not objectionable, but the other features of the charge should, in our opinion, be omitted.

Counsel for plaintiffs in error insist that the court erred in permitting argument of counsel for the State to go to the extent that it did. Some of the language used by counsel for the State, and found in the bill of exceptions, does not appear to have been excepted to at the time the argument was made. The comments of counsel in arguing a case before a jury are controll-

able in the discretion of the trial court, but this dis-
cretion is subject to review, and when counsel make
material statements outside of the evidence which are
likely to do the accused an injury, it will be deemed an
abuse of discretion when not stopped by the court on
objection made. Newton vs. State, *supra;* Killins
(*alias* Williams) vs. State, 28 Fla. 313, 9 South. Rep.
711; People vs. Aikin, 66 Mich. 460, S. C. 11 Am. St.
Rep. 512. In Willingham vs. State, 21 Fla. 761, it was
held that objections to the argument of counsel as being
beyond the evidence or otherwise improper should be
made at the time of such abuse of the right or priv-
ilege of argument, and the action of the court over-
ruling the objection, and the fact that exception was
taken to such ruling, should appear with the objection
in the bill of exceptions. The bill of exceptions re-
cites as follows: "The defendants object to so much
of the argument to the jury by Major Abrams, of
counsel for the State, as is in the following language:
I go further, and say that if these murders are not
punished, the State of Florida is largely responsible
for the failure of justice; that the State has failed and
refused to furnish to its officer the adequate means to
make conclusive every possibility—not merely proba-
bility, but every possibility—and that when the man
who speaks before you succeeded in passing in the Sen-
ate of Florida a bill to furnish the State with the
means for investigating all secret crime, it was laid
on the table in the House, and that man who opposed
the bill in the House was the member of the Legisla-
ture from Orange county who lives in Sanford." We
do not hesitate to express our disposal of the language
quoted. There was no testimony to authorize such
comment, and it was calculated to prejudice the ac-

cused, as it was made to appear that the father of Mc-
Rae, one of the accused, lived in Sanford.

So far as we can see there was nothing improper in
counsel taking up a pistol that had been put in evi-
dence, and stating that it had been identified as the
pistol of one of the defendants.    There was testimony
tending to prove such fact.    Nor was there any im-
propriety in counsel, during his argument, handing the
pistol to the jury to be examined.    The pistol had been
put in evidence before the jury and testimony intro-
duced as to its condition.    The jury could properly
examine the pistol to see its condition, and it was not
improper for counsel to ask them to do so.

The other language used by counsel, and found in
the record, does not appear to have been even objected
to, and we will not refer to it.

After deliberation, the jury returned into court and
announced that they had agreed upon a verdict, and
handed to the clerk a paper signed by the jurors as
follows, *viz:* "We, the jury, find the defendants guilty
as charged, but recommend Marion Clinton to the mercy
of the court." The court declined to receive the return
as a verdict, and made certain statements to the jury
in reference to their verdict.    Counsel excepted to
what the court said to the jury, and insist that the
province of the jury was invaded.    As the judgment
must be reversed on other grounds, we do not deem it
necessary to specially consider the exceptions on this
point, further than to call attention to some decisions
bearing on it.    We have held that a finding like the
one referred to above in cases of homicide is under our
statute a nullity, and no judgment or sentence can be
pronounced upon it.    Hall vs. State, 31 Fla. 176, 12
South. Rep. 449; Lovett vs. State, 31 Fla. 164, 12 South.
Rep. 452; Murphy vs. State, 31 Fla. 166, 12 South. Rep.

453. In Grant vs. State, 33 Fla. 291, 14 South. Rep. 757, the jury returned a verdict of manslaughter in the first degree and the court refused to receive it, stating to the jury at the time that the verdict was not in such form as could be received by the court, and directed the jury to retire and present a verdict in proper form. The trial of the case was under the Revised Statutes, abolishing degrees in manslaughter. We said that while it was entirely clear that the trial judge may send a jury back to the consultation room for the purpose of correcting their findings as to matters of informality or uncertainty, and when the issue had not been passed upon by them, yet the judge must not even suggest the alteration in substance of the verdict, and that the action of the judge in reference to the correction of verdicts should be with great caution. In Bryant vs. State, 34 Fla. 291, 16 South. Rep. 177, the verdict was, we, the jury, find the prisoner guilty of murder in the first degree, and on objection to the form of the verdict by the State attorney, the court directed the jury to retire, and if they agreed to return a verdict of guilty of murder in the first degree against the prisoner, to name him in their verdict. This was held to be not improper. See also People vs. Bonney,, 19 Cal. 426.

When a jury returns such a finding as the one stated in this case, the case is still in their hands, and their duty in the premises remains undischarged. The court can not consider such a finding as being a verdict of murder in any degree, and can not, of course, then any more than at any other time intimate to the jury what their verdict should be.

The judgment of the court below is reversed and a new trial awarded.